NORTHWESTERN LUMBER COMPANY, Appellant, vs. WIS-
CONSIN TAX COMMISSION, Respondent.

*April 3—November 11, 1930.*

374

For the appellant there were briefs by *Bundy, Beach & Holland* of Eau Claire, and oral argument by *P. M. Beach*.

For the respondent there was a brief by the *Attorney General* and *A. L. Hougen* of Manitowoc, special counsel, and oral argument by *Mr. Hougen*.

The following opinion was filed July 22, 1930:

ROSENBERRY, C. J.   We shall in this case adopt a different method of treatment than that ordinarily pursued.  Four questions are raised which involve consideration of independent facts.  We shall first state the facts relevant to a question, then the opinion in respect thereto will follow.  The matters involved are stumpage values, land values, Below stock, and surtaxes.

### Stumpage Values.

On January 1, 1911, the plaintiff owned 117,210.37 acres of land.  The timber had been removed from about forty per cent. of this land prior to January 1, 1911.  Plaintiff contends that upon that day there were upon the lands 177,134,911 feet of timber.  Defendant computed the number of feet of timber at 197,028,866 feet.  The defendant arrived at the amount of timber by taking the figure fixed by the March 1, 1913, federal questionnaire returned by the plaintiff and adding to it the amounts cut in 1911 to 1915, both inclusive, and adjusting purchases, sales, and costs.

The principal controversy arises in respect to the value of the standing timber.  The commission was required to deal with a wasting asset acquired by the plaintiff long prior to January 1, 1911.  In order to determine what income if any was apportionable to the years succeeding January 1, 1916, it was necessary for the defendant to fix the value of the plaintiff's timber holdings as of January 1, 1911.  *Falk v. Wis. Tax Comm.* 201 Wis. 292, 230 N. W. 64.  Prior to December 28, 1909, the plaintiff had not carried its stand-

ing timber as an asset upon its books, and on that day by resolution of the board of directors book values were fixed as follows:

Percentage

| | | | | | |
|---|---|---|---|---|---|
| 13.16 | 50,000,000 ft. pine ....... | $12 | 00 | $600,000 | 00 |
| 59.21 | 225,000,000 ft. hemlock .... | 2 | 50 | 562,500 | 00 |
| 5.26 | 20,000,000 ft. basswood ... | 7 | 00 | 140,000 | 00 |
| .40 | 1,500,000 ft. oak ....... | 16 | 00 | 24,000 | 00 |
| 10.53 | 40,000,000 ft. birch ...... | 3 | 00 | 120,000 | 00 |
| 3.16 | 12,000,000 ft. ash ....... | 5 | 00 | 60,000 | 00 |
| 5.26 | 20,000,000 ft. elm ........ | 5 | 00 | 100,000 | 00 |
| 2.23 | 8,500,000 ft. tamarack ... | 2 | 50 | 21,250 | 00 |
| .70 | 3,000,000 ft. miscellaneous | 5 | 00 | 15,000 | 00 |

100.00 380,000,000 ft. ................. $1,642,750 00

*Land account* ......................... $625,271 40
   113,685.71 acres @ $6 per acre ....... 682,114 26
   Less same acreage as inventory of December 31, 1908, @ .50 per acre.. 56,842 86

Credited to surplus account ........... $625,271 40

Referring to this statement, if we divide the total value of the timber, $1,642,750, as fixed by the resolution, by the total number of feet, 380,000,000 feet, we get a weighted average or unit value of $4.32 per thousand feet. Applying this to the amount of timber claimed by the plaintiff to be on hand January 1, 1911, 177,134,911 feet, gives a total stumpage value of $765,222.82. The commission, however, arrived at a different amount. It took the actual cutting records of the defendant, from which it found that the plaintiff had on January 1, 1911, 197,028,866 feet. Allowing $12 per M for pine and $2.25 per. M for other woods gave a total value of $857,682.64. Dividing the total value by the total number of feet gives a weighted average of $4.35 per M. There was testimony offered in the record to the effect that the principal tracts of pine had been cut prior

to January 1, 1916. There remained on hand January 1, 1916, 94,000,568 feet, of which 15,000,000+ was pine. Of the total amount 7,225,950 feet were purchased after January 1, 1911. Inasmuch as the purchases and the sales were averaged in and out, the purchases may be ignored as far as the general result is concerned. To this the commission applied an average value of $2.25 per M. The value of the timber then remaining on January 1, 1916, was $210,534.64. In determining the income of the taxpayer the commission applied to the amount on hand January 1, 1916, a value of $2.25 adjusted for purchases and sales, and on that basis computed the taxpayer's income. It is the contention of the taxpayer that the commission should have applied a unit value throughout. It appears, however, that the taxpayer itself did not pursue that method. The weighted average per thousand feet applied by the taxpayer for the years prior to January 1, 1916, was $6.17, but it was not uniform, the weighted average in 1913 being $7.81. The commission arrived at the weighted average value of the timber of all species by averaging a considerable number of purchases made by the taxpayer in the years 1910, 1911, 1912, and 1913, and also taking the average value based upon other purchases of timber of similar kind and quality. If the commission had computed the tax on the basis of a weighted average of $4.35 per thousand feet from January 1, 1911, it would have arrived at substantially the same result at the end of the cut, but it would have resulted in a smaller tax in the years subsequent to January 1, 1916, because the commission in the computation upon which the tax was assessed allowed the depletion taken by the taxpayer in the years prior to 1916 to stand. In other words, it depleted the stumpage as per cutting records but allowed the amount of depletion in dollars as taken by the taxpayer to stand. However, this is not controlling. The controlling question is the value of 94,000,568 feet of timber remaining on January 1,

1916. While there is no evidence from which it can be determined whether the timber remaining on January 1, 1916, was owned by the taxpayer on January 1, 1911, the method pursued by the commission gives the taxpayer the full benefit of the doubt.

It is argued by the taxpayer that the uniform rate should be applied even though a higher rate of depletion had been taken in prior years, because the taxpayer, the commission, or any one else cannot now ascertain the amount of timber of the various species which was on hand January 1, 1916. It is considered, however, that the evidence amply sustains a finding that the timber on hand January 1, 1916, as it stood on January 1, 1911, was fairly worth, as found by the commission, $2.25 per thousand. Whether or not if we were the original triers of the fact we should arrive at that conclusion, certain it is that there is sufficient evidence to sustain the finding of the commission to that effect. It is considered, therefore, that the determination of the commission with respect to the amount of stumpage on hand and the rate of depletion must be sustained.

## Land Values.

A reference to the table already referred to will disclose that on January 1, 1909, the company had 113,685.71 acres which it valued at $6 per acre. From time to time the company appreciated the value of this land upon its books, and on January 1, 1911, it stood at $7 per acre, and on January 1, 1914, at $11 per acre. Thereafter there was a conference between the taxpayer and the commission and the land inventory was appreciated an additional $1.50 per acre, bringing its book value to $12.50. The last item of appreciation of $1.50 per acre was reported and upon it the taxpayer paid a tax. It is also contended by the taxpayer that it paid a tax upon the appreciation taken after January 1, 1911, and before the last item of appreciation of $1.50 per

acre taken in 1914. We are unable to verify this claim from the records and must assume, therefore, that it was not reported and no tax was paid thereon. If a tax was levied on the appreciation taken between January 1, 1911, and January 1, 1916, the defendant concedes that the value of the land should be increased accordingly. The commission valued the lands at $6 per acre as of January 1, 1911, then it added $1.50, being the appreciation taken in 1914, upon which the taxpayer paid a tax, and used this as cost in computing profit on real-estate sales. The evidence sustains the finding of the commission in this respect.

All of the real-estate sales made by the taxpayer were made on a basis of a down payment of more than twenty-five per cent. of the purchase price. In reporting its income the taxpayer reported to the commission these sales, gave the total selling price, the amount of the down payments, the year of the sale, the amount paid in subsequent years, and allocated to each payment its proportion of the profit. In making its reassessment the Tax Commission treated these sales as completed sales in the year in which they were made and computed the tax accordingly. The order of the Tax Commission by which it determined to treat sales as completed transactions where twenty-five per cent. or more was paid down, went into effect November 2, 1925. There can be no question but that the method pursued by the taxpayer accurately reflected its income. However, it distributed it over the years of payment, while the method pursued by the Tax Commission after 1925 allocated the total income to the year in which twenty-five per cent. or more of the selling price was received. It was plain from the reports made by the taxpayer that it followed the method of allocating the income to payment. The commission having accepted these reports, no additional facts having been disclosed by the re-audit, it is considered that the method of the taxpayer should be adhered to for sales made prior to Novem-

ber 2, 1925, and that the computation should be made on the basis of $7.50 as the value of the land as of January 1, 1911, instead of $12.50 as claimed by the taxpayer. We shall not undertake to pass upon the matter of completed sales generally, but hold that in this case the method used by the taxpayer with the approval of the Tax Commission should be adhered to.

### Below Lumber Company Dividends.

The taxpayer owned stock in the Below Lumber Company for which it paid $24,700. In the year 1917 the Below Lumber Company took an inventory of its assets, increased the book value thereof so that the stock owned by the taxpayer was valued at $47,838.96, whereupon the taxpayer appreciated on its books the Below Lumber Company, reported $23,138.96 in that year as profit, and returned it as income in its 1918 report. The report for that year showed a loss, and no income tax resulted from including this item as profit in its report. The assets of the Below Lumber Company were liquidated in the years 1918, 1919, and 1920, the taxpayer receiving in dividends $47,935.29. The Tax Commission in its reassessment referred these liquidating dividends to the years in which they were received by the company and computed income accordingly.

The taxpayer objects to this proceeding because of the fact that it had reported a profit of $23,138.96 in its report for 1918 which was the subject of a conference and deliberate allowance by the Tax Commission. This contention would find some support in *State ex rel. Schuster Realty Co. v. Wis. Tax Comm.* 184 Wis. 175, 197 N. W. 585, 199 N. W. 48, did the transaction reported in 1918 result in income. We have recently held in *O. H. Ingram Co. v. Wis. Tax Comm., ante,* p. 202, 231 N. W. 160, that neither taxable income nor deductible loss results from the fluctuation in the value of corporate stock held by a taxpayer. The stock must be disposed of before either taxable income or deductible loss

results. The transaction reported in the income report of 1918 gave rise to no income upon which an income tax could be based. If as a matter of fact an income tax had been actually paid, the circumstance would give rise to a strong equitable appeal to avoid a double tax upon the taxpayer. However, we have no such situation. There was no income arising in 1917 and reported in 1918. The taxpayer paid no tax on the income so reported because in that year its report showed a loss. As the transaction gave rise to no income, there was nothing for the commission to act upon and its action should not anticipate or defeat an income tax when such income was actually received. The action of the Tax Commission with respect to such a transaction is not entitled to the same finality that was accorded its assessment in the *Schuster Realty Company Case, supra,* or as we accord in this case under the subject of *Land Values.* The commission's determination in this respect is sustained.

### Surtaxes.

It is also urged that the Tax Commission was in error in applying to the ascertained income so-called surtaxes. These include the teachers' retirement fund (ch. 459 of the Laws of 1921 as amended) and the soldiers' bonus (Laws 1919 (special session), ch. 5). While the so-called surtaxes involve some matters not applicable to ordinary income tax rates, in the main they are, so far as income is concerned, merely increases in the rate to be applied in the different brackets of income, and we see no reason why the increased rate should not be applied on a reassessment of the taxpayer's income. If the taxpayer appreciated the value of its land, carried the appreciated value into surplus and thereby made itself liable for a greater tax than it would otherwise have been required to pay, we do not understand how this method of procedure requires that the prescribed rate should not be paid upon the ascertained income. The commission's determination in this respect is sustained.

The plaintiff alleges that the method pursued by the Tax Commission in this case results in an invasion of its constitutional rights under the Fourteenth amendment to the constitution of the United States as well as under the constitution of the state of Wisconsin, principally because the commission in going back of the statutory limitation set by sec. 71.10 deprives the plaintiff of depletion values amounting to many thousands of dollars, deprives the plaintiff of its property without due process of law, denies it the equal protection of the law, and takes its property for public use without compensation. In our view of the case no constitutional question is raised. In determining the value of the plaintiff's assets as of January 1, 1916, it was necessary for the commission to consider the value of the assets which remained of those on hand January 1, 1911, as of that date. In making the necessary computations and adjustments in order to arrive at the amount of timber on hand and its value, the commission had necessarily to consider not only the amount on hand January 1, 1911, but the amount subsequently purchased and the amounts cut and disposed of between January 1, 1911, and January 1, 1916. The mere method which the commission pursued in arriving at the value in 1916 cannot constitute an unconstitutional taking of the taxpayer's property; nor does the fact, if it be a fact, that the plaintiff's timber holdings were not assessed at the same value that the holdings of other companies were assessed indicate that there was any invasion .of the plaintiff's constitutional rights.

We may be permitted to observe generally that some of the questions presented in this case arise because of a tendency on the part of taxpayers to regard a tentative determination of the Tax Commission as if it were a judgment and so apply to it reasoning that would be applicable in matters *res adjudicata*. It is not intimated that these principles have been invoked in this case in terms, but a good deal of argu-

ment arises from the fact that prior tentative assessments have been treated as finalities. They are not such. The validity of the reassessment law has been sustained. The state should receive the income to which it is entitled under the law. properly applied. That there will be differences of opinion as to methods of application to the complicated circumstances of every-day life must be expected. As administrative officers and taxpayers gain more experience under the law it is to be hoped at least there will be fewer controversies. We have not attempted and shall not attempt to restate the tax, only to indicate the rule of law which should govern the Tax Commission in making its reassessment. The assessment made in all other respects except that relating to sales of land on land contract is affirmed. The determination of the commission in that respect should be reversed.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded with directions to enter judgment setting aside the reassessment and remanding the record to the Tax Commission with directions to reassess the tax as indicated in this opinion.

A motion for a rehearing was denied, without costs, on November 11, 1930.