162 So. 270

## STATE v. MERCHANTS NAT. BANK OF MOBILE.

### 3 Div. 128.

Supreme Court of Alabama.

June 13, 1935.

Rehearing Denied June 29, 1935.

A. A. Carmichael, Atty. Gen., and Frontis H. Moore, Asst. Atty. Gen., for the State.

Rushton, Crenshaw & Rushton, of Montgomery, and Stevens, McCorvey, McLeod, Goode & Turner, of Mobile, for appellee.

KNIGHT, Justice.

Appellee is a national banking institution, doing business as such under the laws of the United States, with its principal place of business in the city and county of Mobile, Ala.

Within the first ten days of April, 1933, the appellee filed a return with the state tax commission, sworn to by its cashier, giving detailed information as to its gross and net incomes for the calendar year ending December 31, 1932. Upon this return, the state tax commission, acting through Hon. S. R. Butler, state tax commissioner, made an assessment against appellee for excise tax for the taxable year of 1933, computing appellee's net income for the year at $66,903.89, and imposing a tax upon it of $3,345.19. From this assessment, appellee took an appeal to the circuit court of Montgomery county, as by the act levying the tax it was authorized to do.

The cause was tried in the circuit court of Montgomery county, and that court modified the assessment made by the state tax commission, ascertaining the appellee's net taxable income for said year to be $15,297.41, and making the assessment against it final for the sum of $764.87.

From this decree, the state has brought the present appeal.

In the court below, the cause was heard and determined upon an agreed stipulation of facts.

On the trial in the circuit court, the appellee contended that the state tax commission improperly disallowed it certain deductions. These deductions were of "three types," and may be listed as follows: $4,290, representing donations or contributions to certain associations, for purposes which we shall hereafter have occasion to designate; $42,958.42 representing amounts charged off on account of losses sustained on bonds purchased by the appellee; and $4,358.06, depreciation claimed by appellee, computed on the actual cost of furniture, fixtures, and equipment; the contention of the state being that the depreciation should be computed on the value at which the furniture, fixtures, and equipment were carried on the books of the taxpayer. The circuit court sustained the contentions of appellee in all particulars.

▮ It appears from the agreed statement of facts that the appellee, the Merchants National Bank of Mobile, made certain donations or expenditures during the year, aggregating $4,290. $4,000 of the above amount was donated or contributed to the community chest of Mobile, through the president and board of directors of appellee, and their action was duly ratified and confirmed by the stockholders of said corporation. Other donations going to make up the total were as follows:

Mobile Clearing House Association for Carnival Association, $50.

Firemen's ball, $5.

Soup kitchen for unemployed, $100.

Rev. A. F. Owens for Thanksgiving and Christmas dinners, $100.

Little Sisters of the Poor, $25.

Cayman Brac sufferers, $10.

The latter items, aggregating $290, were expended by the president and board of directors, and their acts were ratified by the stockholders.

It appears from the evidence in the case that it was the opinion of the directors and stockholders of the bank, and they were actuated thereby, that the expenditure of the $4,000 for the community chest would result in direct benefits to the bank through balances and other business with which the community chest of Mobile and affiliated organizations had favored the bank, and that the support of the community chest by the bank was of material benefit in maintaining the bank's standing in the community. That the bank had pursued that course for a number of years, in order, in part, to relieve as far as possible the unfortunate conditions existing in the community and the demands of charity.

It also appears that for like reasons the other donations or contributions were made: That the Carnival Association, firemen's ball, soup kitchen for the unemployed, the annual Thanksgiving and Christmas dinners, and the institution of the Little Sisters of the Poor were all institutions of long standing in the city of Mobile, depending entirely for their support upon contributions from the business people of said city. That the donation of $10 to the Cayman Brac sufferers came about from the fact that a severe storm had occurred in Cayman Brac Island, in the West Indies, which was a calamity in a region in which the bank handles considerable foreign business.

That in order to maintain the standing of the bank in the community and preserve

its patronage the board of directors regarded it absolutely necessary to make said contributions. The directors were of the opinion that for it not to have made said contributions the bank would have lost patronage and good will greatly in excess of the amount contributed. The state contends that these donations do not constitute proper items of credit to the bank in arriving at its net income.

We will first dispose of the question whether the donations should have been allowed, and this must be determined by the terms of the statute providing for the levy and assessment of the excise tax. General Acts, Extra Session 1933, p. 104.

Subdivision 1 of section 1 (b) of the statute in question, so far as the same applies to the question under consideration, provides:

" 'Net income' shall mean and include the net income for the taxable year, as in this Act defined, arising from the business the privilege to engage in which is hereby taxed computed by deducting from the gross income arising from such business, without any exclusions from or credit to such gross income, the total amount of the following deductions:

"(1) Expenses.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on the business the privilege to engage in which is hereby taxed, including a reasonable allowance for salaries or other compensation for personal services actually rendered. * * "

The Attorney General, in support of his contention that the donations or contributions above mentioned should not have been allowed, has brought to our attention the case of Old Mission Portland Cement Co. v. Commissioner of Internal Revenue (C. C. A.) 69 F.(2d) page 676, affirmed by the Supreme Court of the United States in Old Mission Portland Cement Co. v. Helvering, 293 U. S. 289, 55 S. Ct. 158, 160, 79 L. Ed. 367. We quote from that decision:

"The privilege of deducting charitable donations from gross income, conferred on individual taxpayers by section 214 (a) of the Revenue Act of 1921 (42 Stat. 239), and section 214 (a), Revenue Acts 1924 and 1926, 26 USCA § 955 (a) and note, has not been extended to corporations. A proposal to extend it to them was rejected by Congress pending the passage of the Revenue Act of 1918 [February 24, 1919, 40 Stat. at L. 1057, chap.

18, U. S. C. title 26, section 1262]. Cong. Rec., House, Vol. 56, Part. 10, 10426-10428. Section 234 (a) (1) of the Revenue Act of 1921 (42 Stat. 254), and section 234 (a) (1) Revenue Acts 1924 and 1926, 26 USCA § 986 (a) (1) and note, authorizes corporations to deduct from gross income 'all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.' Article 562 of Treasury Regulations 62, interpretative of the 1921 act, declared that corporations were not entitled to deduct charitable donations. But it recognized the right to deduct donations 'made by a corporation for purposes connected with the operation of its business * * * when limited to charitable institutions, hospitals or educational institutions conducted for the benefit of its employees,' and also donations 'which legitimately represent a consideration for a benefit *flowing directly to the corporation as an incident of its business.*' * * *

"It is a question of fact in each case whether a donation is made to an institution conducted for the benefit of the donor's employees *or is consideration for a benefit flowing directly to the donor as an incident of its business.*" (Italics supplied.)

We can well understand that for a banking institution, doing business in a community, to withhold contributions that the ordinary demands of charity in that community would call for would necessarily result in bringing that institution into disfavor, lose for it prestige, and possibly, to some extent, the good will of the community. The fact is, no bank, depending upon the patronage of the public and its good will for success, can, as a matter of good business, refuse to respond to the reasonable demands of charity in the community. To respond to such calls is as much the duty of a corporation, which lives upon a community, as it is of the individual citizen. But in responding to such benevolent demands, can it be said that the expenditures come within the term "ordinary and necessary expenses paid or incurred" in the conduct of the institution's business?

Of course, it must be borne in mind that the directors of the institution are given a discretion in determining the policy and the conduct of its business, and are likewise given some discretion in determining what expenditures may be neces-

sary in the proper and efficient management of the corporate affairs. That it may, through proper action of its board of directors, sanctioned by the stockholders, as in the case before us, make reasonable donations to charity, and for benevolent purposes, no one will doubt, but when the corporation undertakes, indirectly, it may be true, to charge, or set off, its contributions and donations, in whole, or in part, against a tax demand of the state, or to reduce that demand, such corporation must point to some definite provision of the law authorizing it to do so.

Undoubtedly the bank, under the facts disclosed by this record, had the right to make the donations or contributions in question, but can it be said that in doing so it was warranted in deducting the amount of such contributions from its income, in making its return to the state tax commission?

There is nothing in the statute which, in terms, makes provision for contributions, and we are not authorized, under the guise of construction, to amend the law so as to enable the bank to take credit, in listing its expenses, for the contribution made by it. There is no evidence in the record that shows, or tends to show, that there was a consideration for the contributions, flowing "directly to the donor as an incident of its business."

We are therefore constrained to hold that the court erred in allowing the taxpayer the deduction of $4,290 representing contributions made by it as disclosed in the record.

■ The court committed no error in allowing the deduction of $4,358.06 representing depreciation of furniture, fixtures, and equipment. This depreciation was computed on the actual cost of the property, and in all respects as provided by subdivision (6) of section 1 (b) of the Excise Tax Act.

■ This brings us down to a consideration of the propriety of the court's action in allowing the bank's claimed deduction of $42,958.42, representing the amount charged off by direction of the national bank examiner as for loss sustained on bonds purchased by the bank.

It appears from the agreed statement of facts:

"4. It is further agreed that 'Exhibit C' hereto attached is a true and correct copy of the report of the national bank examiner requiring said write-offs in the bonds thereon shown. It is further agreed that all of the bonds shown on 'Exhibit B' hereto attached were in default of interest at the time of the charge-off of the amounts respectively set opposite said bonds; that all of said issues of bonds contained an acceleration clause providing, in substance, that in the event of any default in payment of interest when due the whole principal would become at once due and payable; and that according to a standard requirement and regulation of the comptroller of the currency of the United States all such bonds may be carried on the books of every national banking association at a value not exceeding their market value; and at a value not exceeding the write-down value placed thereon by the applicable report of a national bank examiner. That it is not admitted by the State that the action of the comptroller of currency is binding on the State or can vary any allowance or deduction not provided by Act No. 111, page 104, of the Acts of the Special Session of Alabama 1933, and that such action of the comptroller or the bank examiner does not ipso facto make such amount either a loss or a bad debt within the meaning of said Act No. 111. The State without admitting that the amount so charged off, to-wit: $42,958.42, is either a loss or a bad debt within the meaning of the Act, admits that the amount or the extent thereof is not greater than approved or required to be charged off by the Federal, State, or Federal Reserve Bank examiner.

"5. It is further agreed that in accordance with said requirements and after ascertaining that the debts evidenced by said bonds were recoverable only in part, the Merchants National Bank of Mobile, Alabama, charged off on the books of said bank the amount not recoverable in their opinion and reduced the amounts at which said bonds were carried on their books to the market value in accordance with the above stated regulation.

"6. It is further agreed that while the bonds listed on said attached 'Exhibit B' as '$15,000 Kreuger & Toll Co., 5 o/o S. G. Debentures,' were not actually in default as to interest at the time of said examiner's report on August 2nd, 1932, it was publicly, generally, and internationally known theretofore that the affairs of

this company were in a highly precarious condition due to irregularities and that Protective Committees had been organized as of May 11, 1932, and prior thereto for protection of the holders of those debentures; that the actual interest default occurred within one month thereafter on, to-wit: September 1, 1932, and that the write-down in value of said bonds was to the market value of said bonds as of the date of the write-down in accordance with the above requirement of the comptroller of the currency of the United States."

In the agreed statement of facts, there is a further stipulation as follows: "It is further stipulated that said bonds do not represent loans of money to said persons, corporations, or associations by. said bank unless the ownership of such bonds be so construed. It is agreed that said bank made no loan of money direct to said persons, corporations, or associations, but that each of said bonds contains the obligation of the maker or obligor person, corporation or association to pay the amout of money named therein to the holder or bearer thereof, and that said bank was at all relevant times and is the holder or bearer of each of such bonds, and that the same were purchased from parties other than the obligors."

The stipulation shows the bonds, gives the cost or book value, the amount charged off by direction of the national bank examiner, the market value after the same were written off, the dates when the defaults occurred, and the date of the national bank examiner's report relative thereto. It appears that all the bonds were in default in payment of interest at the time of the "charge off"; that they all contained an acceleration clause; that in accordance with the national bank examiner's requirement, the bonds were charged off on the books of the bank to the extent not recoverable and reduced the amounts at which the bonds were carried to the market value in accordance with the regulation of the bank examiner.

The bank claims that the bonds are evidences of the indebtedness of the obligors therein, and the state contends that they are not evidence of indebtedness entitling them to be deducted under the State Excise Tax Act. It is the insistence of the state that if the bank is entitled to any deduction by reason of any loss on the bonds, "that such would only arise under subdivision (4) of section 1 (b) of

the Act." This subdivision reads: "Losses.—Losses sustained during the taxable year by the business and not compensated for by insurance or otherwise. The basis for determining the amount of deduction for losses sustained shall be the cost thereof to the taxpayer."

The bank's insistence is that the deduction falls under subdivision 5 of section 1 of said act, which reads: "Debts ascertained to be worthless and charged off within the taxable year; provided, however, in the case of Banks only such debts can be charged off, and to such amount and extent, as approved, or required to be charged off, by State, Federal or Federal Reserve examiners; when satisfied that a debt is recoverable only in part, the State Tax Commission may allow the deduction of a part of such debt."

It is strenuously insisted by the state that bonds purchased by a bank are an investment, and that such property cannot be considered a debt within the meaning of the act in question; that the purchase of a bond in the market from a party other than the original obligor is nothing more or less than an investment; and "that the same rules apply as would apply to real or tangible personal property."

A bond is but a written evidence of a debt, whether in the hands of the original payee, or in the hands of some other person by proper transfer, as in case of bonds payable to bearer by delivery.

In 17 Corpus Juris, § 3, the author defines the term "debt" as follows: "A sum of money which is certainly, and at all events, payable as a debt, without regard to whether it is payable presently or at a future time."

The conclusion is inescapable that the bonds in question represented debts due the bank when default was made in the payment of the interest thereon, under the acceleration clause of the bonds. After such defaults, the holder could maintain an action of debt or indebitatus assumpsit. 17 Corpus Juris, § 1, p. 1372.

As we read and construe subdivision 5 of section 1 (b) of the Excise Tax Act, there is nothing in the act indicating a legislative purpose to give the act in this respect the narrow construction contended for by the state.

The cases relied upon by appellant, viz., Northwestern Lumber Co. v. Wisconsin Tax Commission, 202 Wis. 372, 231 N. W. 865; Ingram Co. v. Wisconsin Tax

Commission, 202 Wis. 202, 231 N. W. 160, and Van Dyke v. City of Milwaukee, 159 Wis. 460, 146 N. W. 812, 813, 150 N. W. 509, are not in point. They treat of the status of purchasers of stock in a corporation. One who purchases stock in a corporation is not a creditor of the corporation, but a part owner of the same; nor is the corporation the debtor of such a person, and such was the status of the parties in the above-mentioned cases.

In the instant case, there was a "charge off" within the taxable year, as worthless, the sum of $42,948.42 of the indebtedness represented by said bonds. This "charge off" was required by the national bank examiner. We think this brings the appellee's case squarely within the provision of subdivision 5 of section 1 (b) of the Excise Tax Act.

It follows that the decree of the circuit court will be here corrected by disallowing the item of $4,290 (representing the contributions and donations made by the appellee), as a proper deduction, and, as corrected, the decree of the circuit court will be here affirmed.

Appellee will be taxed with the cost of appeal.

Corrected and affirmed.

ANDERSON, C. J., and THOMAS, BROWN, and FOSTER, JJ., concur.