77 So.2d 653

**FIRST NATIONAL BANK OF BIRMINGHAM**

v.

**STATE of Alabama.**

3 Div. 635.

Supreme Court of Alabama.

Nov. 11, 1954.

Rehearing Denied Feb. 10, 1955.

White, Bradley, Arant, All & Rose, Lee C. Bradley, Jr., Birmingham, for appellant.

Si Garrett, Atty. Gen., and H. Grady Tiller, Asst. Atty. Gen., for appellee.

**CLAYTON, Justice.**

This is an appeal from a final decree of the Circuit Court of Montgomery County, in equity.

The case involves one phase of the liability of the appellant, The First National Bank of Birmingham, for the tax termed the "excise tax on financial institutions" which was imposed for the taxable year 1944, based on the net income of the appellant (sometimes herein referred to as the Bank) for the year 1943. The state excise tax on financial institutions is imposed for the doing of business in one calendar year based upon the net income of the financial institution involved for the preceding calendar year. Accordingly, while the tax with which we are dealing is imposed for doing business in the year 1944, it is based upon the income of the appellant for the year 1943.

The appellant is a national banking association, having its principal place of business in the City of Birmingham, Jefferson County. In the year 1943, it sold a parcel of real estate, the legal description of which is lots 18 and 19, in block 73, according to the plan and survey of the City of Birmingham made by the Elyton Land Company, located in Birmingham, Jefferson County, Alabama. This parcel is sometimes referred to as the "Hood Corner." The State, through the State Department of Revenue, Dr. H. G. Dowling, Commissioner of Revenue, determined that the Bank had realized a profit of $127,316.28 on the sale of the Hood Corner and three other pieces of property. On its original return, for the purposes of the State excise tax on financial institutions, the Bank had claimed a loss of $272,673.72 on this sale. In the taking of its appeal to the circuit court, the Bank claimed that this loss should have been increased by the sum of $250,000, an aggregate of $522,683.72 on the sale. There was a $10 error in addition.

It seems that there is no dispute as to the sale price of the parcel of real estate by the Bank in 1943. There is also no dispute as to the value of the improvements placed upon the property by the Bank during the time that the Bank owned this property. The real issue of the case was, according to the stipulation of the parties, "What was the cost to the appellant of the Hood Corner exclusive of improvements made thereto after its acquisition?"

"If the Court finds that such cost to the appellant of the Hood Corner (exclusive of improvements as aforesaid) was $299,872.-50 then judgment should be entered for the appellee, affirming the final assessment made and entered by the State Department of Revenue."

"If the Court finds that such cost to the appellant exceeded $299,872.50 (exclusive of improvements as aforesaid) then there should be a judgment entered for the appellant in a principal amount equal to 6% of such excess, with interest on such principal amount as is allowed by law."

It might be well to add that the rate of this tax is 6% of net income.

The Bank strenuously insists that the term "cost" must be construed consistently with the provisions of the Federal law respecting the taxation of national banks

and more particularly with section 548 of Title 12 of the United States Code Annotated.

Prior to November 19, 1926, the Bank was the owner of a parcel of land and building located on the corner of Second Avenue and 20th Street in the City of Birmingham, then known as the First National Bank Building, now known as the Frank Nelson Building. At that time, the Hood Corner was owned by Mr. Frank Nelson, Jr. The Bank desired to construct larger banking quarters and desired to acquire the Hood Corner and also purchased two lots which adjoined the Hood Corner and a third neighboring lot, so that the Hood Corner and the other three parcels together formed a unit fronting 140 feet on Twentieth Street and 150 feet on Third Avenue North in Birmingham. Later, this idea was abandoned and the Bank sold the four parcels in 1943.

Under date of November 19, 1926, the Bank and Mr. Nelson entered into an agreement which provided for the conveyance of the Hood Corner to the Bank by Mr. Nelson and for the conveyance by the Bank to Mr. Nelson of the First National Bank Building (or Frank Nelson Building) and of an adjoining parcel.

It is insisted by the Bank that the 1926 contract provided for the "exchange" of Mr. Nelson's equity in the Hood Corner (that property being subject to a $200,000 mortgage) for $50,000 in cash and the equity of the Bank in the office building (Frank Nelson Building or First National Bank Building), subject to the payment of a purchase money debt of $1,400,000 to be evidenced by bonds and secured by mortgage on the office building.

Under the 1926 contract, the conveyance of the Hood Corner was to be promptly made to the Bank. The deed from Mr. and Mrs. Nelson to the Bank was dated January 22, 1927, and was actually delivered then or on February 19, 1927. On the other hand, the conveyance of the office building to Mr. Nelson was to be made by the Bank "at any time at the option of the said party of second part (i. e. the Bank) not less than

two years nor more than ten years from December 1, 1926." In the meantime, the Bank was to continue in possession of the office building and was obligated to pay to Mr. Nelson the sum of $55,875 per annum, in equal monthly payments, until it made a conveyance of the office building to Mr. Nelson, or his assigns.

Mr. Nelson died shortly after the conveyance of the Hood Corner in 1927, and the subsequent dealings were with his heirs or their assignees. They and the Bank entered into a number of agreements respecting the office building and the terms of its occupancy after the conveyance to the Bank of the Hood Corner.

Pertinent parts of two of the agreements and of the deed to the Hood Corner, are quoted:

### 1926 Contract

"*First.* That for and in consideration of the sum of Five ($5.00) Dollars in hand paid by the party of the second part to the party of the first part, and for other valuable considerations, and in consideration of the party of the second part carrying out and performing the hereinafter stated conditions, covenants and undertakings by it agreed upon, the party of the first part agrees to sell and the party of the second part agrees to purchase that certain property known and described as Lots 18 and 19 in Block 73, according to the plan and survey of the City of Birmingham, as made by the Elyton Land Company, lying and being in Birmingham, Jefferson County, Alabama, under the following terms and conditions:

. *    *    *    *    *    *

"(f) At the time and contemporaneously with the conveyance by the party of the first part to the party of the second part of the above described property, the said party of the second part will pay unto the party of the first part the sum of Fifty Thousand ($50,000.00) Dollars in cash.

"(g) Until the party of the second part has conveyed unto the party of the first part, or to his assigns, the proper-

ty known as Lots 11, 12 and 13 in Block 85, in the City of Birmingham, according to the plan and survey of the Elyton Land Company, on the terms and conditions as hereinafter set forth for the sale of the aforedescribed property by the said party of the second part to the party of the first part, it will pay unto the said party of the first part, or his assigns, the sum of Fifty-five Thousand Eight Hundred & Seventy-five Dollars per annum, in equal monthly payments in advance, on the first day of each month.

"*Second.* In consideration of the sale of said property by the party of the first part to the party of the second part, and the conveyance unto the said party of the second part by the party of the first part of the property agreed upon to be conveyed by the said party of the first part unto the said party of the second part, and for the considerations herein set forth, the said party of the second part contracts and agrees to sell and convey unto the said party of the first part the following described property situated in the City of Birmingham, Jefferson County, Alabama, known as Lots 11, 12 and 13 in Block 85, according to the plan and survey of the Elyton Land Company, upon the following terms and conditions:

\*    \*    \*    \*    \*    \*

"(b) Said property shall be conveyed by the party of the second part unto the party of the first part by warranty deed, except as herein otherwise provided, and said conveyance shall be made at any time at the option of the said party of the second part, not less than two years nor more than ten years from December 1, 1926.

\*    \*    \*    \*    \*    \*

"(d) Contemporaneously with the making of such conveyance, the party of the first part, or his assigns (or the party or parties hereinafter designated, in the event of his death), shall make and execute unto the said party of the second part, promissory notes (or bonds, at the option of the party of the second part), in such denominations and in such form as the party of the second part may elect, aggregating One Million, Four Hundred Thousand ($1,-400,000.00) Dollars, payable on the first day of December, 1946, with interest at the rate of five (5%) per cent, per annum, payable semiannually, from the date of the execution of said notes or bonds, the payment of which notes or bonds shall be secured by a mortgage or deed of trust on said property, said mortgage or deed of trust being executed contemporaneously with the making of said conveyance, and to be made by the grantee in said conveyance."

### Deed.

"Know all men by these presents, That for and in consideration of the sum of Five and No/100 ($5.00) Dollars to the undersigned grantor, Frank Nelson, in hand paid by The First National Bank of Birmingham, a corporation, and for other valuable considerations, and is consideration of The First National Bank of Birmingham, a corporation, carrying out and performing the covenants and undertakings by it agreed upon under and by virtue of the terms of a written agreement entered into on the 19th day of November, 1926, between the undersigned grantor, Frank Nelson, and The First National Bank of Birmingham, a corporation, by the terms of which agreement the said The First National Bank of Birmingham, a corporation, agreed to convey by warranty deed unto the said Frank Nelson, Lots eleven (11), twelve (12) and thirteen (13), and the West half of Lot fourteen (14), in Block eighty-five (85), in the City of Birmingham, Alabama, according to the plan and survey of the Elyton Land Company, which agreement is hereby referred to and made a part hereof as though incorporated herein; the said Frank Nelson and his wife, Olive L. Nelson, do grant, bargain, sell and convey unto the said The First National

Bank of Birmingham, a corporation, the following described real estate, * * *."

### 1936 Agreement.

"This agreement, made and entered into the fifteenth day of August, 1936, by and between The First National Bank of Birmingham, hereinafter called the Bank and party of the first part, and The Frank Nelson Estate, Inc., an Alabama Corporation, Olive L. Nelson, Margaret Nelson DeBardeleben, Charles F. Debardeleben, Jr., Theo L. Nelson and Frank Nelson, Jr., hereinafter called parties of the second part,

### WITNESSETH:

"(a) The Bank entered into agreement dated November 19, 1926, to be found of record in Volume 1675, beginning at page 234 of the records of the Probate Office of Jefferson County, with Frank Nelson, since deceased, relating to the sale and conveyance by the Bank to decedent or assigns of the premises and property described herein, also for the lease of the premises and property by the Bank, for the execution of a purchase money mortgage by decedent or assigns, and other matters. The original agreement so entered into has been modified by sundry written stipulations, including an agreement between the parties hereto dated July 1, 1932. The Frank Nelson Estate, Inc., has succeeded (by written stipulations including an instrument dated May 1, 1928, recorded in the records of the Probate Office of said County in Volume 1883, beginning at page 441) to the rights, title and interest vested in decedent in the said contracts and the premises referred to therein; and the other parties of the second part, as widow and next of kin of decedent or as stockholders in said corporation or otherwise having an interest in the subject matter of said contracts (as to the extent or nature of which the Bank is not concerned) have heretofore jointly entered into an agreement with the Bank by letter dated March 5, 1936, accepted by the Bank with interpretations also accepted by second parties, under date March 11, 1936, and made final as to Plan No. One therein mentioned by written notice by second parties to the Bank dated May 14, 1936.

"(b) This agreement has been entered into in lieu of and in order to supersede and terminate all of said former agreements and instruments and express in this single agreement all agreements between the parties and any of them as to the subject matter of said several and successive agreements and letters.

"Therefore, in consideration of the premises, of the mutual covenants hereof, and of the sum of One Dollar paid by second parties to the Bank, it is agreed by and between the parties hereto as follows:

"1. All of the agreements, acceptances and instruments above mentioned or referred to are merged into and superseded by this agreement and are hereby terminated and discharged, it being agreed that this agreement alone constitutes the entire and only agreement between the Bank on the one hand and second parties or any of them on the other, *relating in any wise to options upon, or to the sale, transfer, lease or occupancy of the premises and building located at the northeasterly corner of Second Avenue, North, and Twentieth Street, in the City of Birmingham, known as Lots 11, 12 and 13 in Block 85, according to the present plan and survey of the City of Birmingham.*

"The Bank shall make payment to Frank Nelson Estate, Inc., of the sum of $2,156.25 per month on the first days of September, October and November 1936.

"2. In consideration of the premises and of the sum of One Dollar and other valuable consideration in hand paid to the Bank by parties of the second part, receipt whereof is hereby acknowledged, the Bank hereby grants unto parties of second part, their succes-

sors, nominees or assigns, the right and option to purchase and receive conveyance by the Bank, by warranty deed, of the above described premises and all improvements and appurtenances thereto belonging, for the additional consideration of One Million Dollars ($1,000,000.00), to be paid by parties of second part, their nominees or assigns in the event of election to exercise this option, within the time and in the manner and subject to the conditions herein stated.

"Notice of intention to exercise the option must be given in writing by parties of second part, their successors or assigns, to the Bank, its successors or assigns." [Emphasis supplied.]

The basic Alabama statutory provision with which we are concerned are those parts of Title 51 of the Code of 1940, which impose the excise tax on financial institutions. This statute was first adopted in 1932, General Acts of 1932, Extra Session, page 107. It was reenacted in 1933, General Acts of 1933, Extra Session, page 104.[1] It is insisted by the Bank that the date of adoption of the initial statute is of great consequence, because the Bank acquired title to the Hood Corner in 1927 according to the Bank's theory of the case.

Two of the important provisions of Section 425(b) of Title 51, supra, are the following:

"* * * (b) 'Net income' shall mean and include the net income for the taxable year, as in this title defined, arising from the business the privilege to engage in which is hereby taxed computed by deducting from the gross income arising from such business, without any exclusions from or credit to such gross income, the total amount of the following deductions: (1) All the ordinary and necessary expenses * * *. * * * (4) Losses sustained and determined during the taxable year by the business and not compensated for by insurance or otherwise. (a) The basis for determining the

amount of any loss or gain shall be the *cost* to the financial institution of the asset disposed of less the actual depreciation sustained on physical assets and any reduction charged as an expense upon stocks, bonds or other securities in previous years. (b) No loss shall be allowable unless the property is actually disposed of and the loss thereby determined or an appraisal of the loss is made and allowed under the supervision of the department of revenue, except as hereinafter provided. * * *" [Emphasis supplied.]

Some pertinent provisions of Section 548, Title 12 of the United States Code Annotated provide "The legislature of each State may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several States may (1) tax said shares, or (2) include dividends derived therefrom in the taxable income of an owner or holder thereof, or (3) tax such associations on their net income, or (4) according to or measured by their net income, provided the following conditions are complied with:

"1. (a) The imposition by any State of any one of the above four forms of taxation shall be in lieu of the others, except as hereinafter provided in subdivision (c) of this clause.

* * * * * *

"(c) In case of a tax on or according to or *measured by the net income of an association*, the taxing State may, except in case of a tax on net income, include the entire net income received from all sources, but the rate shall not be higher than the rate assessed upon other financial corporations nor higher than the highest of the rates assessed by the taxing State upon mercantile, manufacturing, and business corporations doing business within its limits: *Provided, however,* That a State which imposes a tax on or according to or *measured by the net income of,* or a franchise or *excise tax* on, *financial,* mercantile,

---

1. Now Gen.Acts 1935, p. 256, as amended.

manufacturing, and business corporations organized under its own laws or laws of other States and also imposes a tax upon the income of individuals, may include in such individual income dividends from national banking associations located within the State on condition that it also includes dividends from domestic corporations and may likewise include dividends from national banking associations located without the State on condition that it also includes dividends from foreign corporations, but at no higher rate than is imposed on dividends from such other corporations." [Emphasis supplied.]

With these statutes before us, it is necessary to determine the amount that will be allowed to the appellant as cost of the Hood Corner.

The record shows that the Bank only entered items as follows on its books regarding this property:

| | | |
|---|---|---:|
| 12-31-26 | Property of New Bank—Credit Account of E. L. Browne | $ 23,500.00 |
| 2-19-27 | Property of New Bank—Paid Frank Nelson | 50,000.00 |
| 2-19-27 | Property of New Bank—Paid A. A. Gambill and Co. | 26,500.00 |
| 2-19-27 | Property of New Bank—Check to J. P. Stiles—Judge of Probate Recording Deed Nelson Property | 451.00 |
| 2-19-27 | Property of New Bank—Accrued interest on deferred payment since 12/1/26 | 534.73 |
| 7-2-36 | Property for New Bank—Paid Providence Mutual Life Insurance Company—Note due today on Frank Nelson Property | 200,000.00 |
| | Total | 300,985.73 |
| 2-28-35 | Property for New Bank Building | 1,113.23 |
| | Net cost to Bank of Hood Corner | $299,872.50 |

The state strenuously insists that this is the net cost and that the Bank cannot impeach its own records. The Bank on the other hand insists that the Bank Building (Frank Nelson Building) was worth much more than $1,400,000 and that the Hood Corner was worth much more than $250,000 (the values given them in the 1926 contract), and that as the excise tax on financial institutions was not passed until 1932, the Bank would not be bound by these book figures. The Bank showed that it paid Hon. J. P. Stiles, Judge of Probate, recording tax on the deed to the Hood Corner on a value of $450,000. Evidence was offered by a real estate agent, Mr. Williams, that the value of the old Bank Building (Frank Nelson Building) in 1926 was $2,000,000 to $2,500,000 and that the value of the Hood Corner was in the neighborhood of $1,000,000. Comparison was made of the purchase price of the other parcels bought by the Bank at the same time as the Hood Corner, for the purpose of building a new bank building, to the value of the Hood Corner by Mr. Williams, and his conclusion and testimony was to the effect that the Hood Corner was a corner parcel, and was the largest of the parcels acquired by the Bank on which to build and was the most valuable of the properties acquired by the Bank for this purpose. Mr. Williams also brought out factors such as assessments for ad valorem tax and rents received in support of the valuation reached by him. While the State does not admit that values as set by Mr. Williams are correct, it introduced no witness to set a different value.

■ An assessment duly made by the Department of Revenue is prima facie correct and where the appeal is taken by the taxpayer the burden is on the taypayer to show that such assessment is incorrect. Title 51, Section 140, Code of Alabama 1940; Paramount-Richards Theatres, Inc., v. State, 252 Ala. 54, 39 So.2d 380; State v. Pullman-Standard Car Mfg. Co., 235 Ala. 493, 179 So. 541, 117 A.L.R. 498.

■ When the Bank took its appeal to the circuit court, it was necessary for it to show that the assessment was incorrect. For this purpose the Bank offered the testimony of three witnesses together with numerous exhibits. The State contends that the law requires national banks to keep accurate records, that a violation of this requirement is a criminal offense punishable by both fine and imprisonment and hence their records are presumed to be correct, and the Bank is not at liberty to impeach its own records. We cannot subscribe to this theory nor to the further theory advanced by the State that the taxpayer is limited to proving the amount

of its income by recourse alone to its books and records and may not have recourse to other evidence such as the verbal testimony of witnesses. The purpose of the law imposing the State excise tax is to raise revenue for the State. It is not to be used to enforce national or state banking laws. State and Federal banking laws impose their own penalties. Neither a forfeiture, nor a denial of any deduction for income tax nor excise tax is included among these penalties. Lilly v. Commissioner of Internal Revenue, 343 U.S. 90, 72 S.Ct. 497, 96 L.Ed. 769; Doyle v. Mitchell Bros. Co., 247 U.S. 179, 38 S.Ct. 467, 62 L.Ed. 1054; State v. Merchants National Bank of Mobile, 230 Ala. 661, 162 So. 270.

■■■ The court in all cases is seeking the truth about the matters at issue. Of course, statements against interest are admissible against litigants. The State could show that the Bank had made or (in this case) has failed to make certain entries in its books.

■ "The real facts, not bookkeeping entries control the determination of taxable income. Account books are evidential but neither indispensable nor conclusive for or against the taxpayer or the government. They may be offered in evidence by the taxpayer to support his returns or by the government as admissions against interest, where the taxpayer contends that the facts are not as stated therein." Mertens' "Law of Federal Income Taxation", Sec. 5.09; Vol. 1, pp. 182, 183.

■■■ National banks are instrumentalities of the United States. The State of Alabama is without power to tax national banks except as authorized by the United States Congress. The limitations of the Federal Statute cannot be avoided by administrative interpretation nor by legislative action of the State legislature. The State cannot, by any definition of income, alter the terms of the Federal Statute allowing states to tax national banks. The state must, to tax national banks, tax them in the manner provided by Congress. Sec. 548, Tit. 12, United States Code Annotated.

■ Determination of whether or not there was a taxable gain under the statutes imposing the State excise tax on financial institutions cannot be so made as to result in the imposition of a tax on anything but net income within the proper construction of that term in Sec. 548, Tit. 12 of the United States Code Annotated. " ' "Things which are not income cannot be made such by mere legislative fiat." ' " State v. Flenner, 236 Ala. 228, 233, 181 So. 786, 791; State ex rel. Bundy v. Nygaard, 163 Wis. 307, 158 N.W. 87, L.R.A.1917E, 563; Falk v. Wisconsin Tax Commission, 201 Wis. 292, 230 N.W. 64.

As was said in the case of State v. First National Bank of Mobile, 239 Ala. 492, 496, 196 So. 114, 117:

"The statute must be read as a whole in the light of constitutional principles, and also in view of the fact that all the State's power to tax National Banks is permissive, and its statutes must be considered in the light of Federal Statutes granting this permission."

Numerous case are cited by the State to the effect that the transaction was a sale and not an exchange of properties. See, Postal Telegraph-Cable Co. v. Tonopah & T. R. Co., 248 U.S. 471, 39 S.Ct. 162, 63 L.Ed. 365; Gruver v. Commissioner of Internal Revenue, 4 Cir., 142 F.2d 363; Brunsvold v. Medgorden, 171 Iowa 413, 153 N.W. 163.

But the whole evidence shows rather conclusively that in laymen's language the transaction was the exchanging by the Bank of the old bank building to Frank Nelson for the Hood Corner to the Bank at the stated comparative values set out in the contract. But whether a sale or exchange, an element of the cost to the appellant of the Hood Corner was the actual value of the Frank Nelson Building in 1926 (less the $1,400,000 Mr. Nelson was to pay), which cost should enter into the computation of the net profit or loss to appellant when the Hood Corner was sold in 1943. The right to acquire the Frank Nelson Building at the agreed price had much to do with the deeding of the Hood Corner to the Bank by Mr. Nelson.

The State argues strenuously for an estoppel. We do not see that an estoppel can be relied on if the property was acquired before the State levied an excise tax on financial institutions and where the Bank filed no tax return for the year in which the property here disposed of was acquired. If no return was filed then there could have been no representation to the State for it to rely upon and if no return need be filed for a particular year how could the Bank have been keeping silent when it needs must speak? C. I. R. v. Mellon, 3 Cir., 184 F.2d 157.

We recognize and approve the principle that " 'he who is silent when conscience requires him to speak, shall be debarred from speaking when conscience requires him to keep silent' ". Harris v. American Building & Loan Ass'n, 122 Ala. 545, 25 So. 200, 202; McIntosh v. Hill, 212 Ala. 136, 102 So. 101.

"Negligent silence may work an estoppel as effectually as an express representation." Bigelow on Estoppels, 588; Tobias v. Morris, 126 Ala. 535, 28 So. 517; A. S. Knowles Dry Goods Co. v. Gunter, 204 Ala. 411, 85 So. 735; McIntosh v. Hill, supra.

However, we do not see where one is estopped to set up true facts that he has not previously discussed *unless* he has been under some duty to disclose them. If no tax was levied of this kind for 1926 or 1927, the Bank was under no duty to file an excise tax on financial institutions return in 1927. They did file a return for the year in which the Bank building (Frank Nelson Building) was deeded to Mr. Nelson's successors, 1939. However, as we view this case the trade for the Hood Corner was made in 1926 (the deed was delivered in 1927). At this time, Mr. Nelson received a contract whereby the bank agreed to convey to him and he to buy the Frank Nelson Building (old Bank building) for $1,400,000. This contract had a value. This was given by the Bank before the excise tax here involved was passed. Therefore even if the Bank received more for the old Bank building than

$1,000,000 (a right to purchase the Hood Corner for less than its true value), it received this value not in 1939 but in 1926 or 1927.

Title to the Hood Corner passed to the Bank in 1926 or 1927. No excise tax on financial institutions was levied in Alabama at that time. In the event that the Bank made a profit at that time (1926 or 1927) it would not be subject to the State excise tax on financial institutions.

Statutes usually are prospective and not retroactive in operation, unless they provide otherwise. None of the Alabama Statutes levying the State excise tax on financial institutions purports to levy a tax measured by net income of a national bank before 1931. Clearly then the excise tax on financial institutions would not tax a profit made in 1926, nor in 1927.

If the Bank in 1926 gave to Mr. Nelson and his successors anything of value over and above the sum of $250,000, then the Hood Corner cost the Bank more than $250,000. In tax matters it has been held that the court will look to substance not form.

If we look to all of the contracts as a whole and at the deeds as finally delivered, together with the testimony of Mr. Williams, we cannot escape the conclusion that Mr. Nelson and his successors received other valuable consideration upon the deeding of the Hood Corner or upon the signing of the contract of 1926. (i. e. The contract to receive the Frank Nelson Building for less than its true value.)

Conditions changed rapidly. The court takes judicial knowledge of the existence of the depression. First Nat. Bank of Birmingham v. Basham, 238 Ala. 500, 191 So. 873, 125 A.L.R. 656; Jefferson County v. Case, 244 Ala. 56, 12 So.2d 343; First Nat. Bank of Opp v. Wise, 241 Ala. 481, 3 So.2d 68; Great Northern R. Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532. It seems to the court that the fact that additional contracts were made did not, for tax purposes, cancel out all prior agreements. The Hood Corner was never

after its conveyance by Mr. Nelson to the Bank in 1927 reconveyed to Mr. Nelson. The parties were never put back into the position that they were in prior to the contract of 1926.

We must therefore turn to the next question which logically follows: If the Bank gave anything to Mr. Nelson for the Hood Corner other than $299,872.50, *what was the value* of the other thing or contract given for the Hood Corner?

██ Mr. Nelson was to pay to the Bank $1,400,000. The witness Williams placed the value of the Bank building at the time of the trade at $2,000,000 to $2,500,000. If we subtract from $2,000,000 the sum agreed in the 1926 contract to be paid by Mr. Nelson of $1,400,000, we arrive at a figure of $600,000. To this we add the $299,872.50 paid in cash, on mortgages and as fees, etc., and arrive at a figure of $899,872.50 which we hold to be the cost to the Bank of the Hood Corner. This case must therefore be remanded to the circuit court for its orders in conformity to this opinion.

Reversed and remanded.

All the Justices concur, except GOODWYN, J., not sitting.