## LILLY ET AL. *v.* COMMISSIONER OF INTERNAL REVENUE.

No. 158.   Argued December 3, 1951.—Decided March 10, 1952.

*Randolph E. Paul* argued the cause for petitioners. With him on the brief was *Louis Eisenstein.*

*Solicitor General Perlman* argued the cause for respondent. With him on the brief were *Acting Assistant Attorney General Slack, James L. Morrisson* and *I. Henry Kutz.*

MR. JUSTICE BURTON delivered the opinion of the Court.

Petitioners, Thomas B. Lilly and Helen W. Lilly, his wife, were engaged in the optical business in North Carolina and Virginia in 1943 and 1944. Pursuant to agreements reflecting an established and widespread practice in that industry in those localities, they paid to the respective doctors, who prescribed the eyeglasses which they sold, one-third of the retail sales price received for the glasses. The question here is whether such payments were deductible by petitioners as ordinary and necessary business expenses under § 23 (a)(1)(A) of the Internal Revenue Code.[1] For the reasons hereafter stated we hold that they were.

Petitioners owned and operated as partners the City Optical Company with offices in Wilmington, Fayetteville and Greensboro, North Carolina, and Richmond, Virginia. Petitioner Helen W. Lilly also owned and operated the Duke Optical Company in Fayetteville.

Since long before 1922 when Thomas B. Lilly established his business in Wilmington, eye doctors, in that locality and to a substantial extent throughout comparable communities in North Carolina, Virginia and elsewhere in the United States, not only examined their patients' eyes and prescribed glasses, but also sold them the glasses. The doctors bought the frames and lenses at wholesale, prepared and fitted the glasses to the patients and sold the glasses at a profit.

---

[1] "SEC. 23. DEDUCTIONS FROM GROSS INCOME.

"In computing net income there shall be allowed as deductions:

"(a) EXPENSES.—

"(1) TRADE OR BUSINESS EXPENSES.—

"(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ." 53 Stat. 12, 56 Stat. 819, 26 U. S. C. § 23 (a) (1) (A).

Lilly and other opticians offered to fill the prescriptions for the doctors and to supply and fit the frames to the patients. To compensate the doctors for their loss of profit on the sales, the opticians generally paid the doctors one-third of the retail price of the glasses. While information as to this arrangement was not volunteered to the patients, it was freely disclosed on inquiry. The doctors made it a practice to ask their patients to bring in their new glasses for verification of the prescriptions and to enable the doctors to see that the frames were properly fitted. Without further charge, they made whatever reexaminations and modifications were needed.

For income tax purposes, petitioners treated their payments to the doctors as ordinary and necessary expenses of carrying on business and deducted them from their gross incomes. The doctors, in turn, included them in their taxable gross incomes. However, in 1943 and 1944, the respondent Commissioner of Internal Revenue disallowed these deductions in petitioners' returns and thereby increased petitioners' taxable income as follows:

|  | City Optical Company | Duke Optical Company |
|---|---|---|
| 1942 | $57,063.45 [2] | |
| 1943 | 61,601.95 | $6,568.87 |
| 1944 | 60,021.65 | 4,798.35 |

The Tax Court sustained the Commissioner on the ground that the payments to the doctors were contrary to public policy. One judge dissented. 14 T. C. 1066. The resulting tax deficiences totaled $124,107.78. The Court of Appeals affirmed. 188 F. 2d 269. We granted certiorari, 342 U. S. 808, to resolve the disputed question of statutory construction and to pass upon the application

---

[2] The year 1942 was involved in the calculation of the tax for 1943 because of § 6 of the Current Tax Payment Act of 1943, 57 Stat. 145–149.

to these facts of the principles announced in *Textile Mills Corp.* v. *Commissioner,* 314 U. S. 326, and *Commissioner* v. *Heininger,* 320 U. S. 467.

The facts are not in dispute. The payments to the doctors were made by petitioners monthly in the regular course of their business. Under the long-established practice in the optical industry in the localities where petitioners did business, these payments, in 1943 and 1944, were normal, usual and customary in size and character. The transactions from which they arose were of common or frequent occurrence in the type of business involved. They reflected a nationwide practice.[3] Consequently, they were "ordinary" in the generally accepted meaning of that word. See *Deputy* v. *du Pont,* 308 U. S. 488, 495; *Welch* v. *Helvering,* 290 U. S. 111, 114.

The payments likewise were "necessary" in the generally accepted meaning of that word. It was through making such payments that petitioners had been able to establish their business. Discontinuance of the payments would have meant, in 1943 or 1944, either the resumption of the sale of glasses by the doctors or the doctors' reference of their patients to competing opticians who shared profits with them. Several doctors testified that they had recommended petitioners and petitioners' competitor, the American Optical Company, simultaneously. Both were sharing profits with the doctors on substantially the same basis. If either had stopped making the payments while the other continued them, there is no reason to doubt that the doctors thereafter would have omitted their recommendation of the nonpaying optician. In 1943 and 1944

---

[3] The American Optical Company, with more than 250 outlets distributed over 47 states, followed this practice, both in competition with petitioners and elsewhere. See also, Snell, Some Principles of Medical Ethics Applied to the Practice of Ophthalmology, 117 A. M. A. J. 497–499 (1941); "What Do You Pay for Eyeglasses?" Fortune Magazine, Oct. 1940, p. 103.

94

the continuance of these payments was as essential to petitioners as were their other business expenses. As has been said of legal expenses under somewhat comparable circumstances, "To say that this course of conduct and the expenses which it involved were extraordinary or unnecessary would be to ignore the ways of conduct and the forms of speech prevailing in the business world." *Commissioner* v. *Heininger,* 320 U. S. 467, 472.[4]

There is no statement in the Act, or in its accompanying regulations, prohibiting the deduction of ordinary and necessary business expenses on the ground that they violate or frustrate "public policy."

The Tax Court in the instant case made no finding of fact that the payments to the doctors were not ordinary and necessary business expenses. It sustained the Commissioner's disallowance of their deductibility because it held that, as a matter of law, the contracts under which the payments were made violated public policy.[5]

We do not have before us the issue that would be presented by expenditures which themselves violated a federal or state law or were incidental to such violations.[6]

---

[4] ". . . Without this expense, there would have been no business. Without the business, there would have been no income. Without the income, there would have been no tax. To say that this expense is not ordinary and necessary is to say that that which gives life is not ordinary and necessary." *Heininger* v. *Commissioner,* 133 F. 2d 567, 570.

[5] "We conclude that the payments under the contracts between the two optical businesses, composed of petitioners, and the oculists are not deductible as ordinary and necessary expenses *because* the contracts under which these payments were made violated public policy." (Emphasis supplied.) 14 T. C. at 1086.

[6] Deductions to cover penalties for unlawful conduct were disallowed in *Commissioner* v. *Longhorn Portland Cement Co.,* 148 F. 2d 276 (penalties for violation of state antitrust laws); and *Great Northern R. Co.* v. *Commissioner,* 40 F. 2d 372 (penalties against railroad for violating federal statutes or regulations). Cf. *Rossman*

In such a case it could be argued that the outlawed expenditures, by virtue of their illegality, were not "ordinary and necessary" business expenses within the meaning of § 23 (a)(1)(A).[7]

In *Textile Mills Corp.* v. *Commissioner,* 314 U. S. 326, this Court accepted an interpretation of that section by a Treasury Regulation which disallowed the deduction of certain expenditures for lobbying purposes. In doing so, the Court referred to the fact that some types of lobbying expenditures had long been condemned by it, and that the interpretative regulation had itself been in effect many years with congressional acquiescence. The instant case does not come within that precedent.

In *Commissioner* v. *Heininger,* 320 U. S. 467, this Court was asked to go further and to disallow certain attorneys'

---

*Corp.* v. *Commissioner,* 175 F. 2d 711, 713–714 (where an overcharge under the Emergency Price Control Act was allowed to be deducted because it did not frustrate any "sharply defined policies" of the Act). As to deductibility of legal fees incident to the defense of a taxpayer against charges of illegal conduct, see *Commissioner* v. *Heininger,* 320 U. S. 467, s. c., 133 F. 2d 567; *Kornhauser* v. *United States,* 276 U. S. 145; *Commissioner* v. *Longhorn Portland Cement Co., supra;* 4 Mertens, Law of Federal Income Taxation, 384–389; and see generally, Note, 54 Harv. L. Rev. 852–860.

[7] The Government calls attention to its prosecution of certain other opticians in other states, in 1946, for violations of the Sherman Antitrust Act due to price-fixing agreements made with oculists in the course of interstate commerce. The consent decrees in those cases lend little support to the Government's contention that the payments made by petitioners in 1943 and 1944 in North Carolina and Virginia were not deductible. In fact, the recitals in those decrees tend to confirm the existence of a long-established, widespread, undisturbed practice of the kind described. *United States* v. *Bausch & Lomb Optical Co.,* Civil Action No. 46C 1332; *United States* v. *American Optical Co.,* Civil Action No. 46C 1333; *United States* v. *House of Vision-Belgard-Spero, Inc.,* Civil Action No. 48C 607; and *United States* v. *Uhlemann Optical Co. of Illinois,* Civil Action No. 48C 608 (all in U. S. D. C. N. D. Ill.).

fees and other legal expenses. They were reasonable in amount and had been lawfully incurred by a licensed dentist (1) in resisting the issuance by the Postmaster General of a fraud order which would have destroyed the dentist's business and (2) in connection with subsequent proceedings on judicial review of the same controversy. While the services resulted in an injunction which stayed the order during the time that the taxable income in question was received, the final result of the litigation was unsuccessful for the taxpayer. Nevertheless, the expenditures were permitted to be deducted as ordinary and necessary expenses of the taxpayer's business. The opinion in that case reviews the position of the Bureau of Internal Revenue, the Board of Tax Appeals and the federal courts. *Id.*, at 473–474. It refers to the narrowing of "the generally accepted meaning of the language used in § 23 (a) in order that tax deduction consequences *might not frustrate sharply defined national or state policies* proscribing particular types of conduct." (Emphasis supplied.) *Id.*, at 473. It concludes that the "language of § 23 (a) contains no express reference to the lawful or unlawful character of the business expenses which are declared to be deductible. . . . If the respondent's litigation expenses are to be denied deduction, it must be because allowance of the deduction would frustrate the sharply defined policies of 39 U. S. C. §§ 259 and 732 which authorize the Postmaster General to issue fraud orders." *Id.*, at 474. Neither that decision nor the rule suggested by it requires disallowance of petitioners' expenditures as deductions in the instant case.

Assuming for the sake of argument that, under some circumstances, business expenditures which are ordinary and necessary in the generally accepted meanings of those words may not be deductible as "ordinary and necessary" expenses under § 23 (a)(1)(A) when they "frustrate sharply defined national or state policies proscribing par-

ticular types of conduct," *supra,* nevertheless the expenditures now before us do not fall in that class. The policies frustrated must be national or state policies evidenced by some governmental declaration of them. In 1943 and 1944 there were no such declared public policies proscribing the payments which were made by petitioners to the doctors.

Customs and the actions of organized professional organizations have an appropriate place in determining in a factual sense what are ordinary and necessary expenses at a given time and place. For example, they materially affect competitive standards which determine whether certain expenditures are in fact ordinary and necessary. Evidence of them is admissible on that issue. They do not, however, in themselves constitute the "sharply defined national or state policies" the frustration of which may, as a matter of law, preclude the deductibility of an expense under § 23 (a)(1)(A).

We voice no approval of the business ethics or public policy involved in the payments now before us. We recognize the province of legislatures to translate progressive standards of professional conduct into law and we note that legislation has been passed in recent years in North Carolina and other states outlawing the practice here considered.[8] We recognize also the organized activities of the medical profession in dealing with the subject.[9] A resulting abolition of the practice will reflect

[8] Remington's Wash. Rev. Stat., 1949 Supp., § 10185–14; Deering's Cal. Business and Professions Code, 1951, §§ 650, 652; N. C. Laws 1951, c. 1089, §§ 21, 23.

[9] The present trend may lead to the complete abolition of the practice. If so, its abolition will have been accomplished largely by the direct action of those qualified to pass judgment on its justification. This gradually increasing opposition to the practice bears witness to the widespread existence of the practice in such recent times as 1943 and 1944. See Resolution of Section on Ophthalmology of

itself in the tax returns of the parties without the retroactive hardship complained of here.[10]

The judgment of the Court of Appeals is reversed and the cause is remanded with directions to remand to the Tax Court with instructions to set aside its judgment insofar as it is inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

---

the American Medical Association adopted in June, 1924, but not then presented to the A. M. A. House of Delegates, quoted in 117 A. M. A. J. 498 (1941); Address of Chairman Albert C. Snell, M. D., before the Section on Ophthalmology, 117 A. M. A. J. 497–499 (1941); Principles of Medical Ethics of the American Medical Association (1943 and 1949); editorials in 131 A. M. A. J. 1128 (1946); 136 A. M. A. J. 176–177 (1948).

[10] The payments made to the doctors in the instant case, and disallowed as deductions by the courts below, amounted to between 56% and 72% of petitioners' taxable business income. The income thus taxed had been transferred long ago to the doctors and they had paid their income tax on it.