**STAPLE GIN COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 1615.**

United States District Court
S. D. Texas,
Corpus Christi Division.

June 26, 1958.

William H. Bloch, Corpus Christi, Tex., for plaintiff.

William B. Butler, U. S. Atty., Newton B. Schwartz, Asst. U. S. Atty., Houston, Tex., for defendant.

ALLRED, District Judge.

This is an action for the recovery of corporate income tax deficiency in the amount of $5,121, paid by plaintiff for the calendar year 1952, with interest amounting to $1,089.01. The question presented is whether $17,070 of losses sustained by plaintiff in 1952 in commodity futures transactions were ordinary and necessary expenses paid or incurred by plaintiff during that year in the carrying on of the trade or busi-

ness of cotton ginning within the meaning of Section 23(a), 1939 Internal Revenue Code, 26 U.S.C.A. § 23(a). Stated in other words, and as set out in a pre-trial order, the issue is: whether or not the $17,070 ordinary loss deduction on plaintiff's tax return for the calendar year 1952, resulting from losses sustained in commodity futures transactions entered into during that year, were "hedging" losses, deductible as ordinary business expense; or, as maintained by defendant, that said commodity futures transaction losses were "speculative" losses which would result in capital loss, therefore not deductible from plaintiff's gross income for 1952.

Plaintiff operates a cotton gin in which its income is derived from (1) a service charge for ginning the cotton; (2) a small profit on bagging and ties; and (3) the main profit from the purchase and sale of cottonseed. Purchases are from farmers ginning their cotton at plaintiff's gin during the short season of July and August. Cottonseed oil mills are the real buyers for the cottonseed. They quote a price on cottonseed to the gins at regular intervals and advise them every time they change the price. The ginner changes his price up or down accordingly and works on a differential or margin of profit. Plaintiff acquires the seed, usually at so much per ton less than it is able immediately to get for it from the oil mill. Plaintiff does not store any appreciable quantities of seed, or any at all for any appreciable time. It makes a quick turnover profit on an average of not more than ten days between purchase and sale, sometimes having the cottonseed sold at the time of purchase. Plaintiff's profit averages $9 per ton.

In February 1952 plaintiff entered into a contract on the Chicago Board of Trade for the short sale of 900 tons of soybean meal for July 1952 delivery. Plaintiff's president and principal stockholder, McDaniel, testified that this was the result of a decision of the officers and management of the corporation [1] to sell this soybean meal against cottonseed that was being grown by farmers in the area from whom the gin would buy it and immediately resell it to cotton oil mills; that there was no intent to *speculate* on the sale of these futures; that the management thought that the cottonseed market couldn't go any way except down and they were protecting the gin's interests; that crop conditions were ideal and they expected a bumper cotton crop which would cause the price of cottonseed to go down; that if this expectation had proved correct, it would have affected the ginner's profits in this way: that the gin would sell the seed and when they bought from the farmers, naturally if the prices were down the ginner would have a bigger margin in them.

McDaniel insisted that the purpose of the short sale of soybean meal futures was to "hedge" since the gin confidently expected a bumper crop and resulting low prices for cottonseed; that the reason it didn't hedge with cottonseed meal was that it was handled only on the Memphis Board of Trade and it is not a very active market while soybean meal is handled on the Chicago Board of Trade, a very active market, and that prices were not quoted on cottonseed; that soybean meal competes in a market with cottonseed meal and, therefore, it is and can be used as a hedge against cottonseed; that if the price had declined on cottonseed in 1952, then he believed that he would have been able to shift the risk to something else; that "if the price had declined on one, we figured it would be the same on the other"; that he

1. McDaniel also testified that this was evidenced by an appropriate resolution of the board of directors. Plaintiff's counsel stated that the company secretary had forgotten the minute book. The court stated that he would permit the witness to testify from his recollection as to the contents of the resolution but would require counsel to make formal proof of the resolution in the proper manner. This was not done.

was just 100% wrong and sustained the loss in question.[2]

Plaintiff's counsel frankly concedes that this soybean transaction was "unique" and not a "typical" hedging operation, certainly as that term had been understood before Corn Products Refinery Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 24, 100 L.Ed. 29; but he insists that under the holding in that case and the reasoning in others,[3] the loss here was an ordinary and necessary expense paid or incurred in carrying on the gin's business in the taxable year.

In the Corn Products case the Court held that purchases and sales of corn futures in order to assure the company an adequate supply to meet demands throughout the year, and designed to guard against price increases, were an integral part of the business, the profits and losses of which must be considered as ordinary, rather than capital, gain or loss; that while the hedge there was not a "true" one, yet a hedge could be against either a price increase or a price decline. The Court pointed to the Treasury Department's ruling in G.C.M. 17322, "distinguishing *speculative* transactions in commodity futures from *hedging* transactions. It held that hedging transactions were essentially to be regarded as *insurance* rather than a dealing in capital assets and that gains and losses therefrom were ordinary business gains and losses."[4] The court further pointed out that this treasury memorandum had been followed consistently by the courts as well as by the Commissioner, and acquiesced in by Congress.

There are many differences and distinctions between Corn Products and the facts here. Perhaps none of them alone would be controlling but, on the whole, they completely repudiate the idea that plaintiff's short sale of soybean meal can be recognized as a hedging operation under the treasury memorandum or the cases. They compel the conclusion that this transaction was pure speculation despite the testimony of McDaniel that it was intended as a hedge. His own testimony shows, I think, that in his own mind it was not a "hedge." He was hard put to state in understandable language, even in reply to leading questions, just what the gin was hedging against.

The gin had no cottonseed in storage or in inventory. It had none contracted for. It did not buy or expect to buy cottonseed for four to five months and then it would be for a quick turnover. It was not growing cotton. It expected to purchase cottonseed from farmers ginning with it at prices below what it knew the oil mills immediately would pay for it. Its profits from buying and selling cottonseed averaged $9 per ton. Its earnings, therefore, would vary, depending upon the size of the cotton crop in the area and the number of bales ginned. The better the crop, the more tons of cottonseed, theoretically, would be bought and sold; but the average profit per ton would remain the same. True a bumper crop *would* mean lower prices for cottonseed as McDaniel testified, but that would not affect plaintiff's profits, except that a good crop, with consequent lower prices, would mean that plaintiff would buy and sell more cottonseed, in other words, do a greater volume of business. As a matter of fact plaintiff's average net profit in the tax year was $9 per ton.

Generally, of course, a hedging operation is thought of in the same sense as the definition given by Mr. William L. Clayton before a United States Senate Committee on Agriculture in 1936: "My definition of hedging is the offsetting of a *market risk* in *one* transaction by a

---

2. Evidently the soybean crop was light also; certainly the price of soybean meal, like cottonseed, increased.

3. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Kornhauser v. United States, 276 U.S. 145, 48 S.Ct.

219, 72 L.Ed. 505; Lilly v. Commissioner, 343 U.S. 90, 72 S.Ct. 497, 96 L. Ed. 769.

4. Emphasis supplied throughout this memorandum.

market risk of the *opposite* nature in *another* transaction involving a like amount of the *same commodity*." Or the definition by Judge Holmes in Commissioner of Internal Revenue v. Farmers & Ginners Cotton Oil Co., 5 Cir., 120 F.2d 772, 774:

> "A hedge is a form of price insurance; it is resorted to by business men to avoid the risk of changes in the market price of a commodity. *The basic principle of hedging is the maintenance of an even or balanced market position. To exercise a choice of risks, to sell one commodity and buy another, is not a hedge; it is merely continuing the risk in a different form.*"

Plaintiff's counsel, pointing to the fact that Judge Hutcheson dissented in that case, says this circuit might likely decide the same issue differently in the light of the Supreme Court's decision in Corn Products; and that Mr. Clayton's definition, likewise, is obsolete in view of Corn Products. I do not think so. Corn Products did hold that, n ıwithstanding the hedge was only against a price *increase*, and not against a *decline*, it nevertheless was a hedge, an integral part of the business, the profits and losses of which must be considered as ordinary, rather than capital, gain or loss. The Fifth Circuit in the recent consolidated Patterson-Hightower case, Patterson v. Hightower, 245 F.2d 765, 767, stated that Corn Products did not conflict with the rule that commodity futures contracts, not acquired for hedging purposes or as a gambling transaction, are capital assets, to be taxed as long-term capital gains and losses. Hedging in Corn Products was by futures contracts *in the same commodity*. The Treasury Memorandum was drafted in the light of the historic practices in "hedging" and the recognition of the definition of the term practically the same as that given by Mr. Clayton.

But, aside from the question of a purchase or sale in the *same commodity*, and treating as proper a hedge in cottonseed by buying or selling soybean meal, the principle is clear that one follows the other; that is, a *buyer* of a commodity hedges by futures *selling;* or buying or selling to protect an inventory or future requirement as an integral part of the business in lieu of storage. "The basic principle of hedging is (still) the maintenance of an even or balanced market position." Commissioner of Internal Revenue v. Farmers & Ginners Cotton Oil Co., supra. Even plaintiff and his witness recognize this.[5]

Here, in February 1952, when plaintiff sold soybean meal, it had no "market position" to maintain or balance. It had no inventory, no storage or plans for storage (other than a few days, not exceeding 10, for a quick turnover). Plaintiff planted no crop, invested in no crop, and contracted for no cottonseed in advance. It simply had the prospect of a profitable business if there was a bumper crop, and a fair business (as it turned out) if the crop was light. Perhaps the same might be said for any other business in a cotton community; but no insurance policy, as such, has yet been devised to insure against such a business risk.

Plaintiff's president testified that he personally had "hedged" in soybean meal as against his cotton growing (as a farmer); but he admitted that he had also "speculated" successfully on soybean meal. From all the evidence I am compelled to hold that the gin was speculating here; that what it did in this instance was, at best, to transfer its risk of large or small volume of profits from purchase and sale of cottonseed to the hazard of a rise or fall in the prices of soybean meal—pure speculation in both instances. This was not only not a "true" hedge, it was no hedge at all. It was not a part of the gin's business, as were the futures transactions in Corn

---

5. See also "How to Hedge *Commodities*," printed by Merrill, Lynch, Pierce, Fenner & Beane (Defendant's Ex. 2).

Products, therefore the gin's profits and losses must be treated as capital, not ordinary, gains and losses.

It follows that judgment will be for defendant. The foregoing will be adopted as findings of fact and conclusions of law.

The Clerk will notify counsel to submit an order accordingly.