**DIXIE MACHINE WELDING & METAL WORKS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 6820.**

United States District Court
E. D. Louisiana,
New Orleans Division.

June 18, 1962.

Deutsch, Kerrigan & Stiles, Eberhard P. Deutsch, Rene H. Himel, Jr., H. Paul Simon, Lansing L. Mitchell, New Orleans, La., for plaintiff.

Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Myron C. Baum, George Elias, Jr., Lester L. Gibson, Attys., Dept. of Justice, Washington, D. C., Kathleen Ruddell, U. S. Atty., New Orleans, La., for defendant.

AINSWORTH, District Judge.

This is a taxpayer's suit for refund of income taxes paid for fiscal years 1951 and 1952. By agreement of the parties it is being decided on its merits on the record consisting of pleadings, affidavits,

depositions and exhibits described in a joint stipulation.[1] The question presented is whether certain payments made to officers and members of crews of foreign vessels by a ship-repair yard to obtain the business and expedite the repairs are deductible as ordinary and necessary business expenses under Section 23(a) (1) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(a) (1).[2] If the payments are deductible, the taxpayer is entitled to refund. We hold that such payments are not deductible, being in violation of sharply defined public policy which proscribes this type of conduct.

Taxpayer contends that there exists in the Port of New Orleans, as in all other ports, a long-standing custom among ship-repair companies to pay to officers and members of crews of foreign vessels under repair, for so-called services rendered, approximately 10% net (after deduction of withholding taxes) of the cost of the repair work. It states that if it did not make the payments it would get no work from foreign vessels; that the payments are in consideration of assistance rendered by the vessels' officers and crew and that cooperation of the ships' personnel is essential to quick and efficient repair work. Therefore, the assistance is valuable, it is said, both to the shipowner and the repair yard.

Taxpayer states that the payments are not bribes to buy approval of bad work but that they are customary among all persons who do business with foreign ships. It is stated that the practice is one of common knowledge in shipping circles and that all vessel owners are familiar with it.

The testimony of the president of taxpayer corporation is offered to support these statements,[3] as are those of other persons stated to be familiar with these practices,[4] to the effect that a net amount of approximately 10% of the amount of the repair bill, or 5% to each, is usually paid in cash to the captain and chief engineer. Numerous affidavits of foreign shipowners and operators are also offered in support of the existence of the custom, that it is usual to make these payments which are said to be unobjectionable from the shipowner's point of view because they facilitate and accelerate the repairs.[5] Taxpayer's president testified that repair jobs are done in its shipyard on a so-called time and material basis. After the bill for actual man-hours and materials is computed, an amount of 14 to 15% is added to it, and the bill is thus padded by recomputing the number of man-hours necessary for a total which amounts to the actual charges plus 14 to 15%.[6] In some in-

1. See stipulation dated November 21, 1961.

2. Internal Revenue Code of 1939:
"§ 23. Deductions from gross income.
"In computing net income there shall be allowed as deductions:
"(a) [As amended by Sec. 121(a), Revenue Act of 1942, c. 619, 56 Stat. 798] *Expenses.*
"(1) *Trade or business expenses.*
"(A) *In general.* All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *."

3. See deposition, Exhibit P–11.

4. The depositions are made by four steamship agents, Abaunza (Exhibit P–4), Barr (Exhibit P–5), Gordon (Exhibit P–8) and Whitcomb (Exhibit P–12); one ship repairer, Binnings (Exhibit P–6); and three former foreign ship officers, Fredotovich (Exhibit P–7), Rusovich (Exhibit P–9)

and Svendsen (Exhibit P–10), the latter two of whom were subsequently employees of taxpayer.

5. See affidavits of taxpayer's affiants, P–14 through P–29, inclusive, and P–32, of whom four were from Italy, four from The Netherlands, three from Denmark, two from Norway, one from Brazil, one from Germany, one was a former master of Yugoslav and Panamanian vessels, and one was identified as a foreign ship captain (Schultz, Exhibit P–28).

6. See testimony of taxpayer's president, Szodomka (Exhibit P–11, p. 24), as follows:
"Q When you make these payments— and I understand that every contract that you get you expect to make a payment that amounts from 5 to 10% to the master or captain or the crew—when you enter into the contract you figure that in

stances, the services of members of the crew are also employed in making repairs and the number of hours a shipowner's crew works is also added to the bill as if they were employees of taxpayer.[7] When foreign ships arrive in the Port of New Orleans, they are met by representatives of taxpayer who attempt to obtain repair business. It is generally known that taxpayer is willing to give the officers of the ship "a new hat"[8] and, accordingly, taxpayer receives a large portion of the business sufficiently substantial that in fiscal 1951 it amounted to 19% of its total business, and in 1952 36% of its total business.[9] It is said that the captain and chief engineer expect these payments and if they are not given taxpayer would not get the work nor would it obtain the cooperation of the crew during the performance of the repairs. It is, therefore, the practice of taxpayer to make such payments to the captain and chief engineer of all foreign-owned ships. American ships' personnel do not exact such payments and these ships are usually represented by American agents who have authority themselves to secure repairs. On the other hand, repairs of foreign vessels are secured entirely by the captain and chief engineer who have the sole prerogative of selecting the ship-repair yard.

Taxpayer, therefore, contends that the making of such payments is a practice which is universal, of long standing, well known in shipping circles and is known to the owners of the vessels. The Government sharply disputes this and, to contradict taxpayer's contention, produced a number of affidavits of foreign shipowners, all of whom had repairs made by taxpayer during the fiscal years involved.[10] In every instance the shipowners disclaimed any knowledge of the payments, said they were unaware that their bills for repairs had been padded, disputed the right of their captain and chief engineer to take such gratuities and condemned the practice generally. Some of the Government affiants said they were unaware of any such practice though they had heard hints about it on occasions. They absolutely condemned the practice as being opposed to the interests of their companies and said they would severely discipline and might even discharge employees who were caught in such transactions; other Government affidavits showed that some foreign owners doing business with taxpayer were aware that some of their officers and members of the crew were taking gratuities but they were fighting against the practice, severely condemned it and said they were particularly unaware that it had been done by taxpayer when repairs were made to their ships in New Orleans.

██ It cannot be said that plaintiff has clearly established by a preponder-

---

as part of the cost of your work, don't you?

"A Yes, sir.

"Q *And that is added to the price?*

"A *That is added to the price.* That was added to it before he signed the bill.

"Q I don't know if you understood me right. You figured on adding that to the total of the amount which you charged?

"A The best way that I can explain that, is I have some on the job and don't show it on the payments. *We add so many manhours to the job.*

"Q And then you figure what you are going to pay back and that is added to the cost of the contract?

"A Man-hours on the job.

"Q And that is what you expect to get in toto from the ship owners for your work?

"A Yes." (Emphasis added.)

7. Szodomka (Exhibit P–11, p. 20), as follows:
"* * * In other words, they help us so much as they can *and we charge the full time for these men, like we charge anybody else.* We give him a little more. That don't happen very often." (Emphasis added.)

8. Aesopian for kickback.

9. Szodomka (Exhibit P–11, p. 38).

10. See affidavits of the Government's affiants, G–2 through G–21, inclusive, of whom one was from the United States (George Elias, Jr., Tax Division, Department of Justice), three from Norway, four from The Netherlands, seven from Italy, two from France, and three from Germany. (Exhibit G–20 is joint affidavit by two German citizens.)

ance of the evidence that the practice is universal or known to the owners of the ships repaired by it; there is ample evidence to the contrary. Affidavits of taxpayer's witnesses do not indicate whether the firms represented by the witnesses had ships which were repaired by taxpayer; on the other hand, the affidavits of the Government witnesses specifically stated that they are by persons who used the repair services of taxpayer at New Orleans. The Government evidence is, therefore, specific in its contradiction and denial of the so-called universal custom of paying kickbacks [11] of an average of 10% to the captain and chief engineer where repairs are made to foreign vessels.[12] If these payments or kickbacks are to be allowed and deductible as ordinary and necessary business expenses, they must not frustrate sharply defined state or national public policy.[13]

In Lilly v. Commissioner of Internal Revenue, 343 U.S. 90, 72 S.Ct. 497, 96 L.Ed. 769 (1952), the United States Supreme Court permitted as deductible business expenses payments made by optical companies to physicians who referred their patients for the filling of prescriptions for eyeglasses. The Heininger rule was nevertheless cited with approval but on the facts the court held that there were no sharply defined state or national policies frustrated thereby.[14]

■ In Louisiana, the situation is different. The practice of making payments of the kind described here is a violation of the Commercial Bribery Statute of that state. LSA–R.S. of 1950, Title 14, § 73.[15] The evidence shows to our satisfaction that foreign shipowners actually doing business with taxpayer were not aware of the 10% kickback nor

11. "Kickback" is defined in Webster's Third New International Dictionary (unabridged) as: " * * * a percentage payment exacted as a condition for granting assistance by one in a position to open up or control a source of income or gain * * *."

12. The withholding tax due the United States is retained by taxpayer—it amounts to 4 to 5%.

13. See Commissioner of Internal Rev. v. Heininger, 320 U.S. 467, 473, 64 S.Ct. 249, 253, 88 L.Ed. 171 (1943): "The Bureau of Internal Revenue, the Board of Tax Appeals, and the federal courts have from time to time, however, narrowed the generally accepted meaning of the language used in § 23(a) in order that tax deduction consequences might not frustrate sharply defined national or state policies proscribing particular types of conduct. * * *" See also Tank Truck Rentals v. Commissioner of Internal Rev., 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958), in which the court held not deductible fines imposed on truckers who violated state maximum weight statutes, and said, "Certainly the frustration of state policy is most complete and direct when the expenditure for which deduction is sought is itself prohibited by statute. * * * If the expenditure is not itself an illegal act, but rather the payment of a penalty imposed by the State because of such an act, as in the present case, the frustration attendant upon deduction would be only

slightly less remote, and would clearly fall within the line of disallowance." See also Cammarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959).

14. Taxpayer cites Fiambolis v. United States, 152 F.Supp. 10 (E.D.S.C.); Valetti v. Commissioner, 28 T.C. 692; Richardson v. Commissioner, C.C.H. 16, T.C. M. 518, 4 Cir., 264 F.2d 400, involving gratuities made by ship chandlers to officers of foreign vessels which were held to be deductible. But the evidence showed *without dispute* in these matters that the owners of the ships *knew* that the commissions were being paid by the chandlers. Such is not the case here, for this fact is sharply disputed in the present case and the evidence shows to the contrary.

15. LSA–Revised Statutes of 1950, Title 14, § 73: "Commercial bribery is the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any private agent, employee, or fiduciary, without the knowledge and consent of the principal or employer, with the intent to influence such agent's, employee's or fiduciary's action in relation to the principal's or employer's affairs. "The agent's, employee's or fiduciary's acceptance of or offer to accept, directly or indirectly, anything of apparent present or prospective value under such circumstances shall also constitute commercial bribery."

of the padding of their bills by taxpayer in order to achieve this result.[16] The acceptance of gratuities by officers of the ships who were acting in a fiduciary capacity as agents for their shipowner principals was done clandestinely and secretly. The payments were made by taxpayer in cash, in envelopes which were handed to the captain and chief engineer at the time written acceptance of the work was obtained, and no information about them was given to the vessel owners. The transaction was under the table; otherwise, crew members would have been paid in a regular, normal fashion by taxpayer's checks. No receipts were obtained from the captain or chief engineer for the payments for, as taxpayer's president testified, if you were the captain or chief engineer, would you give a receipt for such a payment?[17] The transaction is clearly prohibited by the Louisiana Commercial Bribery Statute and we cannot give our sanction to it.

The Louisiana judicial decisions likewise indicate the illegal nature of the transactions involved here and the impropriety of the crew accepting gratuities without the specific knowledge or consent of their principals, the shipowners. In Foreman v. Pelican Stores, 21 So. 2d 64, 69, the Louisiana Court of Appeal (2 Cir., 1944) summarized the applicable provisions of law as follows:

"It was held in Clement v. South Atlantic S. S. Line, 128 La. 399, 54 So. 920, that: 'An agent must account to his principal for whatever he has received, even unduly, by virtue of his procuration. An agent of a ship broker must restore to his principal all rebates or refunds received by him, in the absence of an express agreement to the contrary. Custom cannot prevail against the provisions of law.'

"To the same effect are: Chinn v. Chinn, 22 La.Ann. 599; Skannall v. Stevenson, 23 La.Ann. 755; Texana Oil & Refining Co. v. Belchic, 150 La. 88, 90 So. 522.

"The common law on the subject is not unlike our own. See: Restatement of the Law, Agency, §§ 403 and 407; 2 Am.Juris. 215, § 268; 13 A.L.R. 907.

"The rule as expressed in American Jurisprudence, supra, reflecting the law of other states, reads: 'It is well established that profits made and advantages gained by an agent in the execution of his agency belong to the principal, unless the parties themselves have otherwise agreed. In the absence of any agreement to the contrary between himself and his principal, an agent is not entitled to avail himself of any advantage that his position may give him to profit beyond the agreed compensation for his services. He will not be allowed to speculate for his gain in the subject-matter of the employment. * * *'."

■ We are aware that taxpayer is not on trial here for the violation of any criminal statute and that this is a civil proceeding and a claim for an income tax refund. Nor are we concerned here with the ethics or morals of the practice. But taxpayer is not entitled as a matter of right to a deduction for business expenses and where payments such as these sharply contravene state law by being in specific violation of prohibitory statutes and are also contrary to state policy as defined by the decisions of its highest courts, they cannot be permitted as ordinary and necessary business expenses under provisions of the Internal Revenue Code.

Accordingly, judgment will be entered dismissing plaintiff's suit.

16. Padding the repair bill to take care of the amount of the payments, and thereby to make the shipowner himself pay for the kickback, without his knowledge or consent, is a species of fraud also forbidden by Louisiana criminal statute. See LSA-R.S. Title 14:67.

17. Szodomka's rhetorical answers (deposition, Exhibit P-11, pp. 30-31) were:
"Do you think if you were a chief engineer you would give a receipt?
"If you were a chief engineer would you give a receipt on it?"