T.C. Memo. 2016-56

UNITED STATES TAX COURT

THOMAS L. RYTHER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17002-13.                    Filed March 28, 2016.

Thomas L. Ryther, pro se.

<u>Sandy Hwang</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  When his steel-fabrication business dissolved, Thomas

Ryther found himself lacking income but in possession of a large quantity of scrap

steel.  To remedy the lack of income, Ryther sold the scrap whenever he needed to

pay his bills.  Ryther reported the sales as taxable income, but the question

presented in this case is whether he had *self-employment* income subject to the

[*2] Code's *self-employment* tax. And the answer to this question depends on whether these sales amounted to a trade or business.

## Background

Ryther incorporated Knight Steel in April 1997 and was its sole owner, officer, and board member. The firm fabricated steel frames, mostly for general contractors. Those contractors would bring large beams to Ryther which he would cut to size and in which he would drill bolt holes so that the contractors could easily assemble them into a frame at a construction site.

Knight Steel's fortunes sagged after the stock market collapsed in 2000. In 2001 it fell behind on paying employment taxes, and the IRS assessed trust-fund penalties against it.[1] The troubles continued, and in 2004 a chapter 7 bankruptcy trustee took over the company to manage its liquidation. The trustee closed the business in April, and the bankruptcy court discharged the company's debts the following January. In winding up Knight Steel's operations, the trustee focused on the company's cash and accounts receivable and chose to abandon the company's few items of tangible property--a couple run-down trailers, some well-

---

[1] The IRS assesses penalties against employers who don't remit the taxes they withheld from employees. These penalties are called trust-fund penalties because money that employers withhold from their workers' paychecks is held in trust for the United States. See Pollock v. Commissioner, 132 T.C. 21, 25 n.10 (2009).

[*3] used fabrication equipment, and a large pile of scrap steel--because they appeared to be worthless.

Ryther didn't let the failure of Knight Steel sideline him. Even before that firm entered bankruptcy, Ryther had incorporated a second business, Mission Steel. When Knight Steel died, Mission Steel took control of its abandoned trailers and fabrication equipment and assumed its land leases. Ryther hoped to continue in the steel-fabrication business, but the new company never did much business. Ryther still had bills to pay, so he needed to find another source of income. He didn't have far to look: The scrap steel was about to come in handy.

Like all fabrication businesses, Knight Steel had generated scrap. The scrap that it generated was of substantial size: Some pieces were 40 feet long and weighed hundreds of pounds. Because he had no need for it when his business was active--except for needing it out of the way--Ryther would just leave the scrap in the empty lot next to his fabrication equipment. In a supersize version of the breeding colonies of paperclips many office workers keep in their desk drawers, Knight Steel's scrap pile grew continually from 1997 to 2004. During all this time Ryther was unaware the scrap had any value, and he never tried to sell it. But in 2004 he beheld the scrap pile and fabricated a new idea. After doing some research, he discovered that scrap had not only value but also an active market.

[*4] He also learned that wholesalers were willing to come to his lot, fill their trucks with scrap steel, and pay him cash for what they took. Over the next seven years he sold scrap steel once or twice a month,[2] to at least five different scrap wholesalers, in sales that totaled over $317,000:

| Year | Receipts from scrap sales[3] |
|------|------------------------------|
| 2004 | $40,367 |
| 2005 | 26,046 |
| 2006 | 45,757 |
| 2007 | 60,584 |
| 2008 | 60,440 |
| 2009 | 55,740 |
| 2010 | 29,838 |

Ryther didn't file tax returns during these years. In February 2012 he untimely filed all seven missing returns, and reported his scrap sales as miscellaneous income. In April 2013 the Commissioner sent him a notice of deficiency and determined that Ryther's sales were a trade or business and his income from those sales was therefore subject to self-employment tax.

---

[2] In the interest of avoiding the IRS, Ryther dealt solely in cash and didn't want more cash on hand than he needed to pay his monthly expenses.

[3] Ryther kept no records, but the parties stipulated these amounts based on his personal expenses for each year.

**[\*5]** Ryther, a California resident, filed a timely petition. The only issue we have to decide is whether his income from the scrap-metal sales is subject to self-employment tax. The parties agreed that they needed no trial and submitted the case under Rule 122.[4]

### Discussion

We begin with the Code. Section 1401 imposes a tax on "self-employment income." Section 1402 defines self-employment income as "net earnings from self-employment" which it defines as "the gross income derived by an individual from any trade or business carried on by such individual." Sec. 1402(a) and (b). Section 1402(c) tells us that the phrase "trade or business" means the same in section 1402 as it does in section 162. Section 162, however, is a dead end. Nowhere in that section--or anywhere else--does the Code define "trade or business."[5] The Supreme Court long ago forged a plug for this gap and defined a trade or business as an activity engaged in for income or profit and performed with continuity and regularity. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

---

[4] All section references are to the Internal Revenue Code in effect for the years at issue and all Rule references are to the Tax Court Rules of Practice and Procedure.

[5] The Code uses the phrase "trade or business" in at least 800 subsections, but never defines it. Commissioner v. Groetzinger, 480 U.S. 23, 27 (1987).

**[\*6]** Other cases tell us that whether an activity is a trade or business is a question of fact. Whitney v. Commissioner, T.C. Memo. 1990-163; see also Higgins v. Commissioner, 312 U.S. 212, 217 (1941).

Both parties thus correctly focus on the factual question of whether Ryther's activity was a trade or business. And we won't pretend the question is an easy one--cases can be found that support each of the parties.[6] We think, however, that the solution is a bit clearer if we begin with the property that Ryther sold rather than how often he sold it. Section 1402(a)(3)(C) exempts the sale of a taxpayer's own property from the definition of "self employment income." But there are two big exceptions. The first is for the sale of property that is the "stock in trade or other property of a kind which would properly be includible in inventory if on hand at the close of the taxable year." Sec. 1402(a)(3)(C)(i). The second is for the sale of "property held primarily for sale to customers in the ordinary course of the trade or business." Id. cl. (ii). In other words, the Commissioner wins if Ryther's scrap sales fall within either exception; Ryther wins if they don't.

---

[6] Compare Hastings v. Commissioner, T.C. Memo. 2009-69, slip op. at 9 (gambling not a trade or business even though taxpayer gambled virtually every weekend and holiday), with Basada v. Commissioner, T.C. Memo. 1998-144, slip op. at 3 (finding that taxpayer's "street-hustling"is business, even absent evidence of time spent hustling).

**[*7]** Property held as "inventory" and property "primarily held for sale in the ordinary course of a trade or business" overlap in many situations. A retailer, for example, might sell a number of different toys. These toys are both in his inventory and held primarily for sale to customers in the ordinary course of business. But inventory is a broader concept and includes many items not held for sale. A car manufacturer, for example, keeps many different auto parts on hand. These parts are also inventory, but are held for assembly into a car and not primarily for sale in the ordinary course of the company's business. We don't have to plumb the hidden depths of this distinction here, though, because the parties agree that Ryther was doing nothing to his scrap but selling it. For this reason, we need only decide if Ryther held the metal primarily for sale in the ordinary course of a trade or business.

Yet here again we seem to run into another statutory dead end. Section 1402 doesn't define the term "property held primarily for sale to customers in the ordinary course of the trade or business." The regulations under section 1402 are similarly silent. But the Code does have a whisper of a clue--both phrases also appear in section 1221(a)(1), which defines what property isn't considered a capital asset. Although section 1221 doesn't define these terms either, there's caselaw under that section and we can look to it to help us solve the mystery

**[\*8]** before us.  See, e.g., <u>Parkside, Inc. v. Commissioner</u>, 571 F.2d 1092, 1094

(9th Cir. 1977) (using section 1221(1) to help construe the meaning of section

543(b)(3)), <u>rev'g</u> T.C. Memo. 1975-14; <u>Si Boo, LLC v. Commissioner</u>, T.C.

Memo. 2015-19 (deciding that the sale of real estate was subject to self-

employment tax for a partnership after first determining the real property was not a

capital asset under section 1221); <u>Gardner v. Commissioner</u>, T.C. Memo. 2011-

137, slip op. at 6 (determining if the taxpayer's activities fell within the meaning

of section 1221(a)(1) and noting that, if they did, the "principal negative

consequence to [the taxpayer] appears to be an increase in his net earnings from

self-employment and the imposition of a self-employment tax").

Distinguishing capital from noncapital assets can be tricky, and the question

is important in most cases because the tax treatment of capital income can be so

different from that of ordinary income.  Not here:  We aren't asked to consider

whether Ryther's gain from the sale of scrap was capital or ordinary, but only

whether its realization requires payment of self-employment tax.[7]  The language in

---

[7] One might wonder why Ryther didn't have to include the value of the
scrap in his taxable income for the year he took possession of it.  Maybe the right
treatment of the scrap was as treasure trove to Ryther on the day it was "reduced to
undisputed possession."  <u>See</u> Rev. Rul. 61, 1953-1 C.B. 17.  The amount of the
income on that day would be measured by some calculation of "its value in United
States currency."  <u>Id.</u>  After that, Ryther would've had a basis in the scrap equal to

(continued...)

**[*9]** section 1402 and section 1221(a)(1) is identical, and we think the cases explaining section 1221(a)(1) are exceptionally relevant.[8]

And this means we have to shift our focus to fine art. In <u>Williford v. Commissioner</u>, T.C. Memo. 1992-450, 1992 WL 188895, a taxpayer who sold pieces of art was a part-time art dealer but claimed that his income from the sale of particular pieces at issue in his case was capital gain because they were from his personal collection. We had to decide if these particular pieces were "held primarily for sale to customers in the ordinary course of a trade or business" or if they were property held as an investment. We used the following factors:

- frequency and regularity of sales;

- substantiality of sales;

---

[7](...continued)
the amount of the income. His future scrap sales would then have amounted to a recovery of basis (plus perhaps a little gain if the price of scrap had increased since the date he found it) instead of ordinary income. Neither party raised the issue, however, and we don't need to consider it further.

[8] Section 1.1402(a)-6, Income Tax Regs., tells us not to worry about the character of any gain or loss. It notes that when income is excluded from self-employment income because it's a disposition of property that isn't inventory or property primarily held for sale to customers, "it is immaterial whether a gain or loss is treated as a capital gain or loss or as an ordinary gain or loss for purposes other than determining net earnings from self-employment." <u>Id.</u> para. (a). And even if the scrap were a capital asset, proceeds from its disposition would still not be earnings from self-employment. Sec. 1402(a)(3)(A).

[*10] • length of time the property was held;

• segregation of property from business property;

• purpose of acquisition;

• sales and advertising effort;

• time and effort spent on sales; and

• how the proceeds of the sales were used.

Id. at *4.

We do the same for Ryther's sale of scrap, and will look at each of these eight factors individually. We also understand that whenever a court uses a multi-factor test, it should be cautious in not letting a finding that some factors point one way and some point the other become an excuse for unconstrained discretion. Multifactor tests are suitably objective only when each factor helps to get an answer to a common question, and that question in a case like Ryther's is whether he held his scrap "primarily for sale to customers in the ordinary course of a trade or business." United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969). And this leads us to another multifactor analysis. Some of the cases tell us that there are three questions a court must ask in a case like this:

• is the taxpayer engaged in a trade or business?

• is he holding the property primarily for sale in that business?

**[*11]** •  were the sales "ordinary" in the course of that business? Paullus v. Commissioner, T.C. Memo. 1996-419. The Ninth Circuit long ago told us that the phrases "trade or business" and "ordinary" are "to be construed in their ordinary meanings." Austin v. Commissioner, 263 F.2d 460, 464 (9th Cir. 1959), rev'g T.C. Memo. 1958-71. It went on to say that "[t]he word 'business' * * * implies that one is kept more or less busy." Id. (alteration in original). It didn't likewise tell us what "ordinary" means. Perhaps it means "[o]ccurring in the regular course of events; normal; usual." Black's Law Dictionary 1273 (10th ed. 2014). Or perhaps it's understood as a "concept of normalcy [that] requires for its application a chronology and a history to determine if the sales * * * to customers were the usual or a departure from the norm." Winthrop, 417 F.2d at 912. We know that "primarily" means "principally" or "of first importance." Malat v. Riddell, 383 U.S. 569, 572 (1966).

In cases where our aim is to distinguish capital from ordinary income, we have held that we have to answer all three questions affirmatively to find property is not capital. That might matter here: Ryther's sales of scrap were certainly "ordinary" in some sense when one considers this entire seven-year history. See Starke v. Commissioner, 312 F.2d 608, 609 (9th Cir. 1963) (considering whole "course of the known years"), rev'g 35 T.C. 18 (1960). It was repetitive and not

[*12] out of the norm. But were the sales part of a trade or business? If not, then their "ordinariness" doesn't matter.

We also pause to note something else that the cases tell us may be important: Ryther as an individual taxpayer is not the same as Ryther acting as agent of either of his corporations. We have little doubt that if Knight Steel had sold the scrap metal, the sales would've been part of its business. But the focus of our analysis has to be on Ryther. In Estate of Ferber v. Commissioner, 22 T.C. 261 (1954), we held that the income from the sale of property transferred through an estate was capital gain and not ordinary income, even though it clearly would've been ordinary income in the hands of the decedent. Id. at 263-64 ("the decedent's estate, which is the petitioner here, is a different taxpayer and items which were not capital assets in the hands of the decedent may nevertheless be capital assets in the hands of the estate"); see also Berry Petroleum Co. v. Commissioner, 104 T.C. 584, 650 n.48 (1995) (noting that the character of property in the hands of one company may be different in the hands of a successor company), aff'd, 142 F.3d 442 (9th Cir. 1998). The Ninth Circuit similarly affirmed us in another case where the character of income changed because it was an estate's rather than the decedent's. Commissioner v. Linde, 213 F.2d 1, 7-8 (9th Cir. 1954), remanding on other grounds 17 T.C. 584 (1951); see also United

**[*13]** States v. Rosebrook, 318 F.2d 316 (9th Cir. 1963) (intent of some members of a joint venture to conduct business of holding property not attributed to one-percent member who held it as investment). Ryther's situation is analogous. With this in mind, we turn to the factors.

Frequency and Regularity of Sales

This factor favors Ryther because he sold scrap on average only once or twice a month. There are a large number of cases where the Commissioner has successfully argued that more active activity than Ryther's wasn't enough to be a trade or business. The taxpayer in Purvis v. Commissioner, 530 F.2d 1332 (9th Cir. 1976), aff'g T.C. Memo. 1974-164, for example, argued that he qualified as a "trader" of securities in order to take advantage of additional deductible expenses. The court found that he was merely an investor, noting that he didn't try to take advantage of short-term swings in market prices and that he "engaged in only 75 sales of securities and ten short-term commodities sales" in six years. Id. at 1334.

The Commissioner likewise prevailed in Assaderaghi v. Commissioner, T.C. Memo. 2014-33. Assaderaghi executed 535 security trades in 2008 and 180 trades in 2009, and yet we found these activities didn't make him a trader. He made these trades on 154 days in 2008 and 94 days in 2009. Similarly, we found that the taxpayer failed to prove he was in the business of gambling in Merkin v.

[*14] <u>Commissioner</u>, T.C. Memo. 2008-146, even though we still found he gambled for over 300 hours one year, <u>id.</u>

There are cases that might seem to favor the Commissioner. For example, in <u>Wineberg v. Commissioner</u>, 326 F.2d 157, 163-64 (9th Cir. 1963), <u>aff'g</u> T.C. Memo. 1961-336, the Ninth Circuit affirmed our finding that the taxpayer was in the business of selling timber, though there were only 107 sales over ten years. In <u>Royster v. Commissioner</u>, T.C. Memo. 1985-258, <u>aff'd</u>, 820 F.2d 1156 (11th Cir. 1987), we found that the taxpayers held real estate for sale in the ordinary course of business, though there were only 40 sales over nineteen years.

We believe that Ryther's case is more like the stock-trading and gambling cases than the timber and real-estate ones. Scrap has published prices, like shares of stock, and is easily liquidated. Like shares of stock it requires little or no expense for maintenance or improvement. The same can't be said for timber and real estate, both of which can require expense and effort to be salable. And the real estate business in particular often sops up significant time and effort in finding customers.

Despite relative ease in finding customers and the little to no effort required to make the scrap salable, Ryther sold scrap at most on 24 days a year, and only once per day. The Commissioner admits that is what makes Ryther's sales

[*15] "sporadic." We find this factor favors Ryther--that he decided to sell the scrap slowly over time instead of in one lump doesn't make the sales a business, any more than liquidating a block of duplexes in a string of sales instead of all at once makes it a business. See Heller Trust v. Commissioner, 382 F.2d 675 (9th Cir. 1967), rev'g T.C. Memo. 1965-302.

Substantiality of Sales

We've previously found that "the large dollar amount of the sales suggests that the property is held for" sale in the ordinary course of a business. Guardian Indus. Corp. v. Commissioner, 97 T.C. 308, 320 (1991), aff'd without published opinion, 21 F.3d 427 (6th Cir. 1994). We've held this to be an important factor, but it is a factor that can go either way. Ryther's sales totaled over $300,000 over seven years. This amount might seem insubstantial to a large company, but it was substantial to Ryther. It is also undisputed that these sales comprised 100 percent of his net income. In this sense, the sales must be substantial. But that doesn't necessarily mean the factor disfavors Ryther. The taxpayer in Williford made a profit of over $1.7 million from selling his personal paintings. Williford, T.C. Memo. 1992-450. As he had reported losses from his business as an art dealer for that year, this meant that his income from those sales was *more* than 100 percent of his net income. We found the amount was substantial, but we nevertheless still

**[*16]** found that this factor favored him because "where substantial profits result from capital appreciation and not the taxpayer's efforts * * * infrequent sales that generate large profits tend to show that property was held for investment." Id., 1992 WL 188895, at *5. Guardian Industries, 97 T.C. at 310-15, shows the contrast. The taxpayer in that case was a photofinishing firm which generated silver waste that it sold to refiners, with total sales reaching close to $6 million during the two years at issue, which was 40 percent of its net income although less than four percent of its gross receipts. We found that these sales were substantial. Id. at 320.

How to reconcile such cases? We think the answer is to look closely at Williford's mention of the "taxpayer's efforts." In Williford, the taxpayer bought eight pieces of art years earlier and did nothing but keep and sell them. Ryther's scrap is in this sense more like art than silver.[9] He didn't do anything to create the scrap. His efforts were limited solely to liquidating it. This is in direct contrast to Guardian where the taxpayer's silver waste was a byproduct of its ongoing business. Guardian, 97 T.C. at 313. Because Ryther's sales were "sporadic" and

---

[9] We will abstain from philistine comments about any other similarities between scrap metal and fine art--Ryther's conduct certainly proves that his scrap metal wasn't site-specific. Cf. Serra v. GSA, 847 F.2d 1045, 1047-48 (2d Cir. 1988).

[*17] generated large profits with little effort, we find that although the sales were substantial, this factor doesn't favor the Commissioner. It's neutral.

Length of Time the Property Was Held

The next factor the cases tell us to look at is the length of time a taxpayer holds property. Like substantiality, this factor can be ambiguous. What makes it ambiguous is that different products can ordinarily take different lengths of time to sell. We held in David Taylor Enters., Inc. v. Commissioner, T.C. Memo. 2005-127, that the sales of classic cars were sales in the ordinary course of business (and thus generated ordinary income). We noted that the taxpayer unquestionably held its classic cars much longer than it held new cars, but thought it was because classic cars required more maintenance, appreciated in value over time, and had a smaller customer base. Turnover of inventory in a market like that is just ordinarily going to be much smaller. We thus found that a holding period of seven to ten years for the classic cars sold during the year in issue didn't mean that they were not being sold during the ordinary course of business.

Our analysis in that case is particularly helpful here. We understood that seven to ten years seemed like a long time to hold property that was supposed to be sold to customers. But we concluded that in that market it was ordinary because classic cars require extensive ongoing care and marketing. Ryther

[*18] likewise sold his scrap over the course of seven years. Unlike Taylor's classic cars, Ryther's scrap required no maintenance. It also required next to no marketing: Scrap has a published market price, and Ryther easily sold it. Indeed, he could've sold it the day he got it. In this market, then, one would expect a short holding period if Ryther was holding it primarily for sale to customers in the ordinary course of business. On the facts of this case, then, a holding period of seven years persuades us that Ryther wasn't holding his scrap for sale in the ordinary course of business.

Segregation of Property From Business Property

This factor is neutral here. Ryther had a single big pile of scrap, not collections of business scrap and personal scrap that he commingled--unlike the taxpayer in Williford who sold art for a living but also had a personal collection.

Purpose of Acquisition

This factor directs us to find out whether a taxpayer bought or made the property in question to hold it or sell it. This factor is also neutral here--there simply aren't enough facts to determine when and why Ryther acquired the scrap. The parties stipulated that Knight Steel abandoned the scrap, that Ryther researched scrap wholesalers, and that Ryther starting selling the scrap in 2004. Perhaps Ryther decided to take possession of the scrap only after he learned there

[*19] was a market for it, which would indicate that he acquired it for resale. Or perhaps he immediately took possession of it, and figured that maybe someday it could be useful, which would indicate that he intended to hold on to it. As this case was submitted under Rule 122, we don't have anything else to go on.[10]

Sales and Advertising Effort

In Williford we also looked at whether the taxpayer advertised the product, or whether he at least did *something* to enhance its value. See also Guardian, 97 T.C. at 325 ("the failure to improve property sold indicates that such property is not held primarily for sale"). Both parties here agree that Ryther spent nothing to sell the scrap, and this lets us find that he didn't advertise the metal or do anything else to make it more salable. But we don't think that would be ordinary in this

_____

[10] Submitting this case under Rule 122 doesn't change the default burden-of-proof rules. Rule 122(b). The default rule is that the burden is on the taxpayer to show the deficiency is wrong, and nothing here changes this. See Borchers v. Commissioner, 95 T.C. 82, 90 (1990), aff'd, 943 F.2d 22 (8th Cir. 1991). At times, we've held that the taxpayer failed to meet his burden because there wasn't enough information in the record. See, e.g., id. at 91; Meunier v. Commissioner, T.C. Memo. 1991-446 ("if the facts were fully developed we might have reached a different result. But, in the present state of the record, we must hold against petitioner for failure to carry his burden of proof"). The record here is more than enough to reach a decision on whether Ryther was engaged in a trade or business. These factors are used to aid our analysis but aren't necessarily exhaustive or mandatory. Guardian Indus., 97 T.C. at 316. Although a little more information would be helpful, the record is nonetheless complete enough for Ryther to meet his burden. A few pieces of the puzzle might've fallen out of the box, but enough are filled in to bring the entire picture into view.

[*20] market. The taxpayer in Guardian also argued it didn't advertise or actively sell the silver waste. Id. at 324. This was true, but we found it didn't favor the taxpayers because "market conditions made it unnecessary for petitioners to engage in any sales efforts to dispose of the silver waste--refiners actively competed to purchase the silver waste." Id. The market for scrap is more like the silver market--it too has established prices, and one can sell by simply picking up the phone and arranging delivery. No other advertising would be ordinary. We find that this factor also neither favors nor disfavors Ryther.

Time and Effort Devoted to the Sales

Ryther was active in selling his scrap. He researched scrap wholesalers and contacted them to arrange sales. The amount of time Ryther actually spent on these activities is, however, entirely unclear. And it doesn't appear that buyers came to Ryther in the way customers come to a store to browse. We therefore find this factor to be neutral.

How the Sales Proceeds Were Used

This factor asks whether Ryther used the proceeds to replace the scrap with more scrap. Using proceeds from sales to replenish inventory is an excellent indicator that the property is held for sale as part of a regular business activity. But "taxpayers who sell off property they do not intend to replace are often

[*21] accorded capital gain treatment for liquidating a capital asset." Williford, 1992 WL 188895, at *7.  In deciding that the fur inherited by the estate in Ferber was capital property, it was important to us that the estate never acquired additional fur with the sale proceeds.  Ferber, 22 T.C. at 264.  This fact bolstered the conclusion that the estate was selling the former inventory solely to liquidate it.  Id.  It's undisputed that Ryther didn't use the proceeds to buy more scrap but slowly liquidated the large pile of scrap to pay everyday expenses.  This factor greatly favors Ryther.

## Conclusion

We find that Ryther's scrap wasn't property primarily held for sale to customers in the ordinary course of a trade or business because the sales weren't part of a trade or business.  "Carrying on a business * * * implies an occupational undertaking to which one habitually devotes time, attention, or effort with substantial regularity.  Merely disposing of * * * assets at intermittent intervals, without more, is not engaging in business . . . ."  Austin, 263 F.2d at 464.  We therefore also find that the income that Ryther realized from selling the scrap isn't net earnings from self-employment under section 1402(a)(3)(C).  As this is the

**[\*22]** only income in question, we conclude that Ryther isn't liable for self-employment tax.

Decision will be entered under Rule 155.
